*Decision will be entered under Rule 50.*

Leopold Adler, Petitioner, et al.,[1] *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 49913, 49914, 49922–49926, 52629, 52630.

Promulgated June 12, 1934.

*J. C. Peacock, Esq.*, for the petitioners.
*John H. Pigg, Esq.*, for the respondent.

OPINION.

Morris: These consolidated proceedings are for the redetermination of the following deficiencies in income tax:

| Petitioner | Docket No. | Year | Amount |
| --- | --- | --- | --- |
| Leopold Adler | 49913 | 1927 | $7,469.49 |
| Do | 52629 | 1928 | 1,022.47 |
| Hannah G. Adler | 49914 | 1927 | 7,014.69 |
| Do | 52630 | 1928 | 5,387.47 |
| E. S. Epstein | 49922 | 1926 | 44.76 |
| Do | 49922 | 1928 | 24.54 |
| Henry C. Grouse, E. S. Epstein, and Jacob Gazan, Executors, Estate of Louis E. Grouse, Deceased | 49923 | 1926 | 889.79 |
| Do | 49923 | 1928 | 730.00 |
| Hugo I. Frank | 49924 | 1928 | 130.04 |
| Melvin L. Adler | 49925 | 1926 | 88.49 |
| Samuel G. Adler | 49926 | 1926 | 123.40 |

The allegation of error common to all of these proceedings pertains to the inclusion in the taxable income of each of the respective petitioners, as a dividend, of the full amount received upon the retirement of certain capital stock in I. Epstein & Brother Co.

[1] The proceedings of the following petitioners are consolidated herewith: Hannah G. Adler; E. S. Epstein; Henry C. Grouse, E. S. Epstein, and Jacob Gazan, Executors, Estate of Louis E. Grouse, Deceased; Hugo I. Frank; Melvin L. Adler; and Samuel G. Adler.

Another allegation of error, set forth in the proceeding of Leopold Adler, Docket No. 52629, was expressly abandoned by counsel at the hearing.

The petitioners, Leopold and Hannah G. Adler, Docket Nos. 49913 and 49914, have amended their petitions to allege that, if the respondent correctly held that the amounts received by them, $50,000 and $47,500, respectively, from the redemption of preferred stock should be treated as taxable dividends, then they could have been included as such only in their respective incomes for 1926, the year in which they were authorized by the corporation and made available to them, and, therefore, the respondent erred in including any part of said amounts in their respective incomes for 1927.

The proceedings were submitted upon a stipulation of facts entered into between the parties, together with the oral testimony of two witnesses for the petitioners and one for the respondent, from which we find the following:

The petitioners in Docket No. 49923 are the duly appointed and acting executors of the estate of Louis E. Grouse, deceased, and the other petitioners are all individual residents of Savannah, Georgia.

On March 1, 1913, Leopold Adler was the owner of 1,805 shares of the common capital stock of I. Epstein & Brother Co., a Georgia corporation, whose principal office and place of business was at all times material herein at Savannah, Georgia. On that date said stock had a fair market value of $175 per share, which amount was greater than the cost thereof to him. On June 29, 1915, he acquired 245 additional shares at a total cost of $50,474.56, and on April 1, 1919, he acquired 100 additional shares at a total cost of $25,000.

On October 15, 1918, Leopold Adler gave to his wife, Hannah G. Adler, 1,000 shares of the common capital stock of I. Epstein & Brother Co., of which 760 shares were out of the 1,805 shares owned by him on March 1, 1913, and the remaining 240 shares were out of the 245 shares acquired by him on June 29, 1915.

On October 15, 1918, Leopold Adler gave one share of the common capital stock of I. Epstein & Brother Co. to each of his two sons, Melvin L. Adler and Samuel G. Adler. These two shares were out of the shares acquired by him on June 29, 1915.

On October 15, 1918, the fair market value of the common capital stock of I. Epstein & Brother Co. was $250 per share.

On March 1, 1913, Louis E. Grouse was the owner of 600 shares and E. S. Epstein was the owner of 250 shares of the common capital stock of I. Epstein & Brother Co., the fair market value of which at that time was as set forth above, which value is greater than the cost thereof to the said Grouse and Epstein.

Except as shown above, there were no changes in ownership or transfers of the common capital stock of I. Epstein & Brother Co.

at any time material to these proceedings. On April 9, 1924, and continuously thereafter until subsequent to April 9, 1928, the entire outstanding common capital stock of that company, consisting of 3,000 shares of a par value of $100 per share, was owned and held as follows:

|  | Shares |
|---|---|
| Leopold Adler (husband-father) | 1, 148 |
| Hannah G. Adler (wife-mother) | 1, 000 |
| Samuel G. Adler (son) | 1 |
| Melvin L. Adler (son) | 1 |
| Louis E. Grouse | 600 |
| E. S. Epstein | 250 |
| Total | 3, 000 |

I. Epstein & Brother Co. was organized under the laws of the State of Georgia in May 1906, with a capital stock of $300,000, all common, consisting of 3,000 shares of the par value of $100 each. At all times material herein, the company was engaged in the wholesale dry goods business at Savannah, Georgia. On April 9, 1924, in conformity with the action of its stockholders and board of directors, at meetings held on April 9, 1924, the company declared and paid a 100 percent dividend upon the common stock, payable in 7 percent cumulative preferred stock, redeemable at the option of the·company after two years from April 9, 1924, and containing various provisions with respect to the payment thereof in full in the event of a distribution of the assets of the company, before the common stock should be entitled to participate in any such distribution. At the same time its authorized capital stock was increased to $600,000, the increase of $300,000 being preferred stock consisting of 3,000 shares of the par value of $100 per share. The action of the stockholders at their meeting, held on the date indicated above, was reflected on the company's minutes as follows:

\* \* \* \* \* \* \*

The President stated that in his opinion a stock dividend of three hundred thousand dollars ($300,000.00) should be declared out of the Undivided Profits. In order to do this, however, he stated that it would be necessary for the stockholders to adopt a resolution increasing the Capital Stock from the present amount of $300,000.00 to six hundred thousand dollars ($600,000.00), and, if this should be done, then to adopt a resolution authorizing the issuance of the stock dividend.

After full discussion, the following resolution offered by L. E. Grouse was unanimously adopted:

WHEREAS, it is the desire of the stockholders to issue a stock dividend of three hundred thousand dollars ($300,000.00), but, in order to do which, it is necessary first to increase the Capital Stock to six hundred thousand dollars ($600,000.00), therefore be it resolved:

1. That, in conformity with the power granted this Corporation by its charter, the Capital Stock of this Corporation be and hereby is increased to six hundred thousand dollars ($600,000.00).

2. That the additional issue of three hundred thousand dollars ($300,000.00) shall be Preferred Stock entitled to dividends at the rate of seven (7) per centum per annum, and no more, payable out of net profits, and cumulative. That each year's dividend and all accumulated unpaid dividends shall be first paid in full before there shall be any dividend declared, or paid on the common stock of this company, and also that in the distribution of assets of this Corporation, under any circumstance, the Preferred Stock shall be paid in full, together with any accumulated dividends, before the Common Stock shall participate in such distribution of assets. Also that said Preferred Stock shall be subject to be called in and retired, at par, plus accumulated unpaid dividends, at the option of this Corporation at any time after two years from the date of this resolution.

3. That the issue of Preferred Stock herein provided for shall be paid for by the Corporation with three hundred thousand dollars ($300,000.00) of its undivided profits, this issue of Preferred Stock being a stock dividend which is hereby declared, and that there shall be delivered to each stockholder of record of the date of this meeting, one share of Preferred Stock, fully paid up, for each one share of Common Stock, now held by said Stockholders respectively.

4. Resolved further that the Secretary of this Company be, and he hereby is, authorized to have prepared and printed the necessary and proper certificates for the issuance of this Preferred Stock, and that the same shall be issued and signed by the Officers of this Corporation as provided in the By-Laws.

There not being any further business, the meeting adjourned.

[Signed]   C. M. Chandler, Jr.,
*Secretary.*

The action of the board of directors at their meeting, held on the date indicated above, is reflected on the company's minutes as follows:

\*        \*        \*        \*        \*        \*        \*

The President stated the meeting was called to consider the matter of declaring a stock dividend in the sum of Three Hundred Thousand Dollars ($300,000.00) of preferred stock, seven (7) per cent, cumulative, as authorized by a resolution adopted this day at a special stockholders meeting.

On motion of L. E. Grouse, duly seconded, the resolution adopted by the stockholders authorizing and declaring the stock dividend having been read to the meeting, the said resolution was in all respects adopted as the action of the Board of Directors, and that, by reference thereto, the said resolution is hereby incorporated in the minutes of this meeting.

There not being any further business, the meeting adjourned.

[Signed]   C. M. Chandler, Jr.,
*Secretary.*

At the close of its fiscal year ended March 31, 1924, I. Epstein & Brother Co. had an earned surplus and/or undivided profits of $830,853.94; and on March 31, 1925 (after the issuance of the stock dividend), $557,099.29. On March 31, 1926, the company's surplus and/or undivided profits amounted to $605,439.20; on March 31, 1927, $553,116.98; and on March 31, 1928, $575,620.67.

On June 10, 1924, Leopold Adler made gifts of preferred stock of I. Epstein & Brother Co. in the aggregate amount of 548 shares. The following schedule shows the number of shares of the preferred stock held by the respective stockholders immediately upon the issuance thereof as a stock dividend, and after the gifts of 548 shares were made.

| Name of stockholder | Shares held immediately upon issuance of preferred stock | Number of shares given each | Shares held after gifts were made |
|---|---|---|---|
| Leopold Adler (husband–father) | 1,148 | ---------- | 600 |
| Hannah G. Adler (wife–mother) | 1,000 | ---------- | 1,000 |
| Samuel G. Adler (son) | 1 | 49 | 50 |
| Melvin L. Adler (son) | 1 | 49 | 50 |
| Louis E. Grouse | 600 | ---------- | 600 |
| E. S. Epstein | 250 | ---------- | 250 |
| Elsie H. Ackerland | ---------- | 250 | 250 |
| Rena H. Frank | ---------- | 150 | 150 |
| Olga H. Adler | ---------- | 50 | 50 |
| Total | 3,000 | 548 | 3,000 |

The preferred stock continued to be held as above set forth until its redemption and/or cancellation as hereinafter set forth. Rena H. Frank is the wife of Hugo I. Frank, and her income for the year 1928 was reported in their joint income tax return for that year.

The board of directors of I. Epstein & Brother Co., at a meeting held on April 7, 1926, adopted a resolution in words and figures as follows:

\*      \*      \*      \*      \*      \*      \*

Upon motion, duly seconded, a cash dividend of 7% on Preferred Stock $300,000.00 was declared, payable at once.

Upon motion, duly seconded, it was decided to retire $150,000.00 of the Preferred Stock effective during the current month.

No further business, meeting adjourned subject to call of the Chair.

[Signed]   C. M. CHANDLER, Jr.,
*Secretary.*

Pursuant to the foregoing resolution, 1,500 shares of preferred stock were canceled and/or redeemed on the dates, from the stockholders, and in the amounts as follows:

| Date | Stockholder | Shares | Par value |
|---|---|---|---|
| 4– 9–26 | Samuel G. Adler | 50 | $5,000 |
| 4– 9–26 | Melvin L. Adler | 50 | 5,000 |
| 4–10–26 | Louis E. Grouse | 300 | 30,000 |
| 4–10–26 | E. S. Epstein | 125 | 12,500 |
| 1–26–27 | Hannah G. Adler | 475 | 47,500 |
| 1–26–27 | Leopold Adler | 500 | 50,000 |
| | Total | 1,500 | 150,000 |

After the cancellation and/or redemption of the foregoing 1,500 shares of the preferred stock, the remaining 1,500 shares were held as follows:

| Stockholder | Shares | Par value |
|---|---|---|
| Leopold Adler | 100 | $10,000 |
| Hannah G. Adler | 525 | 52,500 |
| Louis E. Grouse | 300 | 30,000 |
| E. S. Epstein | 125 | 12,500 |
| Elsie H. Ackerland | 250 | 25,000 |
| Rena H. Frank | 150 | 15,000 |
| Olga H. Adler | 50 | 5,000 |
| Total | 1,500 | 150,000 |

The board of directors of I. Epstein & Brother Co., at a meeting held on April 9, 1928, adopted a resolution in words and figures as follows:

  *   *   *   *   *   *   *

Upon motion, duly seconded, a cash dividend of 7% on preferred stock outstanding was declared, payable at once. Upon motion duly seconded, it was resolve to retire $150,000.00 preferred stock, payable during the current month.

Upon motion, duly seconded, the meeting adjourned, subject to call of the Chair.

[Signed] C. M. CHANDLER, JR.,
*Secretary.*

Pursuant to the foregoing resolution, the remaining 1,500 shares of preferred stock were canceled and/or redeemed on the dates, from the stockholders, and in the amounts as follows:

| Date | Stockholder | Shares | Par value |
|---|---|---|---|
| 4-7-28 | Leopold Adler | 100 | $10,000 |
| 4-9-28 | Hannah G. Adler | 525 | 52,500 |
| 4-9-28 | Louis E. Grouse | 300 | 30,000 |
| 4-9-28 | E. S. Epstein | 125 | 12,500 |
| 4-7-28 | Elsie H. Ackerland | 250 | 25,000 |
| 4-7-28 | Rena H. Frank | 150 | 15,000 |
| 4-7-28 | Olga H. Adler | 50 | 5,000 |
| | Total | 1,500 | 150,000 |

Annual dividends of 7 percent were declared and paid on the preferred stock while it was outstanding.

The total amount distributed by I. Epstein & Brother Co. in redemption and/or cancellation of its preferred stock ($300,000) represented earnings or profits accumulated subsequent to February 28, 1913.

The liquid assets and current liabilities of I. Epstein & Brother Co. on the dates indicated below were as follows:

| Date | Cash | Stocks and bonds | Current liabilities |
|---|---|---|---|
| 3-31-24 | $28,559.74 | $21,567.50 | $394,844.56 |
| 3-31-25 | 66,019.33 | 3,300.00 | 319,703.76 |
| 3-31-26 | 80,682.23 | 3,400.00 | 309,808.51 |
| 3-31-27 | 88,963.76 | 4,300.00 | 231,696.17 |
| 3-31-28 | 32,202.32 | 2,300.00 | 203,365.19 |

In their income tax returns for the years involved in these proceedings, the petitioners reported gains or losses on account of the sums received by them by reason of the cancellation and/or redemption of the preferred stock of I. Epstein & Brother Co., computed on the basis of a certain allocated cost of the common stock to the preferred stock. In arriving at the deficiencies involved, the respondent determined that I. Epstein & Brother Co. canceled and/or redeemed its preferred stock at such times and in such manner as to make the distribution and cancellation or redemption essentially equivalent to the distribution of a taxable dividend, within the meaning of section 201 (g) of the Revenue Act of 1926 and section 115 (g) of the Revenue Act of 1928. If the respondent's determination as to the applicability of sections 201 (g) of the Revenue Act of 1926 and 115 (g) of the Revenue Act of 1928 be sustained by the Board of Tax Appeals, the petitioners concede that the deficiencies involved are correct. Should the respondent's determination be denied, the gain or loss resulting to the petitioners by reason of the amounts received by them in connection with the cancellation and/or redemption of the preferred stock in controversy should be computed upon the basis of allocating to the preferred stock, at the time of the issuance thereof, 28.5714 percent of the cost or other basis of the common stock.

Section 201 (g) of the Revenue Act of 1926, and section 115 (g) of the Revenue Act of 1928, which are identical, provide in part as follows:

If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. * * *

The respondent having asserted deficiencies upon the theory that the amounts received by the several petitioners herein in the redemption of their stock were received " at such time and in such manner " as to constitute them " essentially equivalent to the distribution of a taxable dividend " under the foregoing provisions of the statutes, we are called upon to consider the correctness of this determination. The petitioners offered two witnesses, E. S. Epstein, himself a petitioner and an officer and director in I. Epstein & Brother Co., having been connected with that firm since 1892 when it was operated as a copartnership, and Leopold Adler, also a petitioner herein and the president of that company since its inception in 1906.

Epstein testified that the business of the company from 1906 to 1911 was successful from a financial point of view, but that in

or about the latter year, or in the year following, the trend toward direct selling had manifested itself through the advent of automobile travel, good roads, chain stores, and competition with mail order houses, which compelled the jobber to accept lower grades of credit risks than theretofore. He said that during the period of the war, 1914 until 1919, it was an easy matter to make money and the prevailing conditions prior thereto were temporarily checked, but that after the war they remanifested themselves in an even greater degree than theretofore. The business with small towns, crossroad towns, from which jobbers largely drew their trade, was gradually drying up and in many instances wiped out. This matter was of great concern prior to 1924 and at least once a month the officers of his company held conferences to consider the matter in an attempt to overcome the difficulty. He said that at that time the company was overcapitalized, and that a recommendation had come from an outside source, a banking interest, to one of the company's officers that a "helpful solution" would be to create a preferred stock issue of $300,000, with the idea of liquidating it as soon as convenient. He did not say, however, how this was to help in the solution of the problem complained of.

Adler, the other witness to testify, it appears, was the officer of the company to whom the recommendation just referred to was made. He testified that he put the question of how the capital of his company might be reduced to his New York bankers and that he was referred to one Osgood, the bankers' employee, who attended to nothing but "tax matters," who advised him to issue a 100 percent stock dividend. Upon cross-examination counsel for the respondent, speaking of the recommendation made by Osgood, asked the witness if "He advised you * * * that you could pay or declare a stock dividend of one hundred per cent and redeem it after two years from the declaration, in which event the gain would only be taxable at twelve and a half per cent?" To this question the witness replied in the affirmative. He said that the "substance" of his conversation with Osgood was how to accomplish a distribution and incur the least tax.

The respondent produced the testimony of a revenue agent who made the investigation respecting the subject matter here under discussion. He said he explained to Adler that he was going to treat the entire amount received in 1927 from the redemption of the preferred stock by the company as a dividend. His statement of the conference had with Adler is as follows:

* * * That some time before the stock dividend was declared and issued by the I. Epstein & Brother Company, he [speaking of Adler] was in a broker's office in New York, and he stated to a man in that office, who was well versed in income tax laws,—and Mr. Adler emphasized the fact that he was not a small

person but was a man of authority. Mr. Adler stated that he explained to this anonymous person in the broker's office that he had a company in Savannah whose surplus was all out of proportion to his capital stock and above the needs of the company. That he wanted to distribute a substantial portion of that surplus to the stockholders. That he himself, and Mrs. Adler, were the principal stockholders in the company. Each one has or did have along then a considerable income each year, and he wanted to know what if any method could be used to distribute that without incurring a large income tax liability, and that this anonymous person outlined to him the plan of declaring and issuing the preferred stock dividend, which could be redeemed after the expiration of two years, and the maximum of twelve and a half per cent tax be paid on the gain which was recognized on the transaction.

In considering this identical question the Board had the following to say in *Annie Watts Hill*, 27 B.T.A. 73, affirmed at 66 Fed. (2d) 45:

Section 201 (g) of the Revenue Act of 1926 and corresponding sections of prior revenue acts were enacted by the Congress in an attempt to prevent the avoidance of tax upon distributions of corporate earnings, ordinarily to be distributed as dividends and so taxable, by means of redemption and cancellation of stock. It leaves to the Commissioner, in the first instance, and to this Board and the courts to determine what circumstances surrounding the cancellation or redemption of stock shall constitute " such time " and " such manner " as to make those acts and the distribution " essentially equivalent to a distribution of a taxable dividend." Here the parties argue at length upon brief as to the intention with which the stock was issued as a dividend in the first instance; as to whether there was a continuing relation between the issuance and redemption of the stock; and whether those acts were designed and carried out as part of a unified plan to distribute surplus.

These matters are of importance, for, should it appear that it was intended when the stock was issued that the later redemption should be the means of distributing earnings which otherwise would be paid to the stockholders in the form of dividends, and that this plan continued over the interval during which the stock was outstanding so that the issuance and redemption are related to each other as a part of that plan, it would seem that the redemption was " at such time " and in " such manner " as to make it, and the resultant distribution, equivalent to a taxable dividend. In other words, such circumstances would indicate that a cancellation or redemption of outstanding stock had been employed as an artifice by which to avoid the ordinary tax upon a corporate distribution. *Cf. Pearl B. Brown, Executrix,* 26 B.T.A. 901; *Harry A. Koch,* 26 B.T.A. 1025; *Alfred A. Laun,* 26 B.T.A. 764; *Robert R. Meyer.* 27 B.T.A. 44.

There is no mention whatsover of liquidation in the various resolutions concerning the distribution in 1924 of preferred stock, nor in the resolutions concerning the later redemptions thereof. Epstein, a minority stockholder, apparently knew nothing about the real plan or purpose back of the distribution or redemptions except what appears to have been inferred by him from the general condition of the jobbing business to which he testified, that is, he knew nothing about the purpose which Adler, himself, has evidenced here. Adler

and his wife were the principal stockholders of the corporation. He sought advice respecting the distribution of the corporation's earnings "without incurring a large income tax liability" and he was the moving party who caused the distribution and the ultimate redemptions of the stock based upon the advice which he had received.

While ultimate liquidation because of unfavorable conditions affecting the jobbing business may have been in the minds of the parties even as far back as 1912, when the outlook seemed more or less questionable, there is nothing in the record to associate or to identify such liquidation as the motive for either the distribution or the later redemption.

The respondent has found that the amounts in question should be taxed as ordinary dividends, and we are of the opinion that there is insufficient evidence to overcome that finding. Indeed, from the evidence of record it is reasonably clear that there was a "unified plan" to distribute the surplus of the corporation "and that this plan continued over the interval during which the stock was outstanding so that the issuance and redemption are related to each other as a part of that plan." *Annie Watts Hill, supra.* Nor does the fact that the distributions here occurred in 1924 and the redemptions were not until 1926, 1927, and 1928 alter the conclusion reached where the evidence tends to show that the time element was designedly a part of the plan of redemption and where the actual time of the redemption bears an identifiable relationship with the originally conceived plan. For instance the original plan, it appears, was to make a distribution in 1924 and it was intended not to make a redemption prior to two years from such distribution—the distribution was made April 9, 1924, and 1,500 shares of such stock were redeemed, beginning with April 9, 1926. The time element, therefore, if it has any bearing upon the question, under the circumstances here, would seem to strengthen the position of the respondent. Upon this point compare the facts in *Annie Watts Hill, supra.*

The petitioners advance the argument that these redemptions were not equivalent to an ordinary dividend because they were not pro rata among all of the stockholders and also because the company did not have funds "available or in sight" with which to pay the $300,000 in April 1924, when the distribution was made.

Even assuming that an equal distribution is an essential part of an ordinary dividend, we are of the opinion that the statute spares us the burden of finding that all of the elements of such a dividend are present. All that we need find under the statute is that there has been a cancellation or a redemption and that the "distribution and cancellation or redemption" were "at such time and in such manner" as to make them "equivalent" to a taxable dividend. The word

" equivalent " is defined in Webster's New International Dictionary (1921) to mean " Equal in worth or value, force, power, effect, import, and the like; alike in significance and value; of the same import or meaning."

Respecting the argument that there were insufficient funds with which to meet the payment of the $300,000 distribution in 1924, we find that just nine days prior to the distribution, to wit, on March 31, 1924, the surplus of the company was $830,853.94. We can not agree with counsel that there were no funds " in sight " at that time with which to make payment. The most cogent answer to that phase of the argument, however, is the fact that ultimate payment was in fact contemplated, as we have already found, and that payment was actually made.

Nor are we impressed by the argument that, because the petitioner in Docket No. 49924 owned no stock after the redemption took place, and the petitioners in Docket Nos. 49925 and 49926 owned only one share of common before and after such redemptions, the statute could not apply. Counsel cites article 629 of Regulations 74, promulgated under the Revenue Act of 1928, which provides in part as follows:

\* \* \* On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. \* \* \*

That language simply means that where the corporation purchases and cancels the stock of a " particular " stockholder and where that was the purpose of the redemption it does not fall within the act because it is not essentially equivalent to the declaration of a taxable dividend. As we said in *Shelby H. Curlee, Trustee*, 28 B.T.A. 773, where the same argument was made:

\* \* \* The taxable status of these distributions under the act, therefore, is fixed by the executed purpose of the corporation, in the determination of which the identity of the stockholders is in no way material. Under petitioner's theory, a corporation with deliberate intent to distribute surplus, could issue a stock dividend, cause the holder of one share of common stock to sell it, then liquidate the stock dividend and be held outside the provisions of section 201 (g), a result in distinct opposition to the purpose of the questioned section. \* \* \*

Respecting the alternative allegation of error urged by the petitioner's counsel that, if we should sustain the respondent's determination that the amounts received by Leopold and Hannah G. Adler, Docket Nos. 49913 and 49914, were taxable dividends, then such amounts should have been included in their respective incomes for the year in which declared, 1926, and not the year in which received, 1927, we are unable to agree.

The petitioners base their contentions upon the following articles of Regulations 69, promulgated under the Revenue Act of 1926:

ART. 52. *Examples of constructive receipt.*—\* \* \* Dividends on corporate stock are subject to tax when unqualifiedly made subject to the demand of the shareholder. \* \* \*

ART. 1541. *Dividends.*—\* \* \* A taxable distribution made by a corporation to its shareholders shall be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands.

It is argued that the funds for "payment in full were probably available from the peak collections in the fall of 1926, but if not could have been borrowed at any time," and from this it is concluded that the amounts were "unqualifiedly made subject to their demands" in 1926. The fault with this argument lies in the very fact that even though the funds may have been available from collections in the fall of 1926, there is no showing that they were, and even though funds might have been borrowed with which to make payment then they were not in fact borrowed. Therefore, under the circumstances, we fail to see how the amounts, although declared, were "unqualifiedly made subject to their demands" in 1926. At any rate it appears that the petitioners treated the transaction as taxable in 1927, as did the respondent, and, in the absence of more concrete proof of the availability of funds with which to make these declarations unqualifiedly subject to their demands, we can not apply the doctrine of constructive receipt. *Hal E. Roach*, 20 B.T.A. 919. Cf. *Avery* v. *Commissioner*, 292 U.S. 210.

*Decision will be entered for the respondent.*