J. Natwick, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 83046.   Promulgated November 12, 1937.

*Benjamin H. McKindless, Esq.,* for the petitioner.

*Fred H. Shearer, Esq.,* and *Benjamin Brodsky, Esq.,* for the respondent.

868

OPINION.

KERN: The present proceeding arises on respondent's determination of a deficiency of $14,051.27 in petitioner's income tax for the year 1932, and involves the single question of whether the cancellation of a debt of $66,679.22 owed the corporation by the petitioner in exchange for his surrender of 843 shares of the company's stock constituted a transaction "essentially equivalent to the distribution of a taxable dividend", within the meaning of section 115 of the Revenue Act of 1932, the relevant provisions of which are set out in the margin.[1] As the price at which the stock was surrendered to the corporation was the same as that paid for it originally by the peti-

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (4) and section 208 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

(b) SOURCE OF DISTRIBUTIONS.—For the purpose of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 113.

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed in partial liquidation (other than a distribution within the provisions of section 112 (h) of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits within the meaning of subsection (b) of this section for the purpose of determining the taxability of subsequent distributions by the corporation.

* * * * * * *

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

(h) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

tioner, respondent concedes that no gain was realized on the transaction unless it is to be treated as a dividend under section 115(g).

Since petitioner and the corporation eventually treated the withdrawals made by petitioner in 1929 and prior years, as set out in our findings, as a loan, by the subsequent execution of a demand note dated December 31, 1929, and no question has been raised either on the pleadings or in argument that these withdrawals constituted income to petitioner in the years of withdrawal, we will consider the sum of such withdrawals as an obligation owing by petitioner to the corporation and canceled by it in 1932 as a part of the transaction herein considered.

The legislative genesis of section 115 (g) has been traced at length in our decisions, *Pearl B. Brown, Executrix,* 26 B. T. A. 901, at 906, 907; affd., 69 Fed. (2d) 602 (C. C. A., 7th Cir.); *Henry B. Babson,* 27 B. T. A. 859, at pages 866, 867; affd., 70 Fed. (2d) 304; see also note, 49 Harvard Law Review 1344 (1936); and we need do no more now than recall that the comparative immunity from taxation which stock dividends acquired under the doctrine of *Eisner* v. *Macomber,* 252 U. S. 189, and the ultimate avoidance of tax on the distribution which could be accomplished by the redemption of such a dividend led to the enactment of the prototype of the present provision in 1921 and to the enlargement of its base in 1926 to include all redemptions in the nature of a dividend distribution.

The present section or its prototypes have been considered by this Board and the courts in thirty odd cases, many of which have been cited by counsel in the present proceeding, and are set out in the margin.[2]

Without deciding whether the question presented here is purely one of fact or a mixed question of fact and law, we are of the opinion that the respondent is correct in maintaining in this case that his determination under this, as under other provisions of the statute,

---

[2] *Henry B. Babson, supra; Pearl B. Brown, Executrix, supra; T. Pierre Champion,* 27 B. T. A. 1312; affd., 78 Fed. (2d) 513 (C. C. A., 6th Cir.); *Girard Trust Co. et al., Administrators,* 32 B. T. A. 926; *August Horrmann,* 34 B. T. A. 1178; *Harry A. Koch,* 26 B. T. A. 1025; *Alfred A. Laun,* 26 B. T. A. 764; *Commissioner* v. *Rockwood,* 82 Fed. (2d) 359, affirming B. T. A. (C. C. A., 7th Cir.); *Salt Lake Hardware Co.,* 27 B. T. A. 482; *Commissioner* v. *Cordingly,* 78 Fed. (2d) 118 (C. C. A., 1st Cir.), affirming B. T. A.; *Commissioner* v. *Quackenbos,* 78 Fed. (2d) 156 (C. C. A., 2d Cir.), affirming B. T. A.; *James A. Connelly,* 30 B. T. A. 331, appeal dismissed February 26, 1936 (C. C. A., 3d Cir.); *Commissioner* v. *Ahlborn,* 77 Fed. (2d) 700, affirming B. T. A. (C. C. A., 3d Cir.); *Parker* v. *United States,* 88 Fed. (2d) 907 (C. C. A., 7th Cir.), reversing District Court; *Louis Rorimer,* 27 B. T. A. 871; *Robert H. Meyer,* 27 B. T. A. 44; *Alfred E. Fuhlage,* 32 B. T. A. 222; *George A. Lembcke,* 33 B. T. A. 700; *Rudolph Boehringer,* 29 B. T. A. 8; *William C. Huntoon,* 14 B. T. A. 459; *James D. Robinson,* 27 B. T. A. 1018; affd., 69 Fed. (2d) 972 (C. C. A., 5th Cir.); *Shelby H. Curlee, Trustee,* 28 B. T. A. 773; affd., subnom. *Randolph* v. *Commissioner,* 76 Fed. (2d) 472; certiorari denied, 296 U. S. 599; *George Hyman,* 28 B. T. A. 1231; affd., 71 Fed. (2d) 342; certiorari denied, 293 U. S. 570; *Elwood W. McGuire,* 32 B. T. A. 1075; affd., 84 Fed. (2d) 431; certiorari denied, 299 U. S. 591; *Brown* v. *Commissioner,* 79 Fed. (2d) 73, affirming B. T. A. (C. C. A., 3d Cir.); *Annie Watts Hill,* 27 B. T. A. 73; affd., 66 Fed. (2d) 45 (C. C. A., 4th Cir.); *Leopold Adler,* 30 B. T. A. 897; affd., 77 Fed. (2d) 733 (C. C. A., 5th Cir.); *C. A. Goding,* 34 B. T. A. 201; *Arthur M. Godwin,* 34 B. T. A. 485.

carries a presumption of correctness which must be overthrown by a preponderance of the evidence on the part of the petitioner. We said in *George Hyman*, 28 B. T. A. 1231, at page 1233 : "From such facts it is just as conceivable that the redemption and cancellation were essentially equivalent to a dividend as it is that they were not; and, since the respondent has determined that they were, and the burden of proof is on petitioner, we can not affirmatively find that it was not."

Subsection (g) embraces any cancellation or redemption of stock, regardless of whether it was issued as a stock dividend, if it is made "at such time and in such manner" as to make the redemption "essentially equivalent" to the distribution of a taxable dividend. Petitioner relies on certain expressions in earlier cases decided by this Board and the courts, which, if read alone, would seem to support the proposition that in order for this subsection to apply there must be an intimate causal relation between the issuance and the redemption of the stock. In *Pearl B. Brown, Executrix, supra*, for instance, we spoke of the absence of any relation between issuance and redemption and of any evidence of a "continuing plan" or of "artifice" (at page 908) ; and we used the same or similar language in other cases in justifying a judgment favorable to the taxpayer; see *Henry B. Babson, supra*, at page 870 ; *T. Pierre Champion*, 27 B. T. A. 1312 ; *Alfred A. Laun*, 26 B. T. A. 764, at page 770 ; *Rockwood Sprinkler Co.*, 13 B. T. A. 393 ; *James A. Connelly*, 30 B. T. A. 331, at page 336 ; *Louis Rorimer*, 27 B. T. A. 871, at page 878 ; but what we have said elsewhere and in later cases clearly indicates that motive, while highly important, is not determinative. In *Annie Watts Hill*, 27 B. T. A. 73, we said at pages 75, 76 :

But the search for a relationship between the issuance of the stock and its redemption, evidencing a continuing, unified plan to distribute surplus, is not the sole test to which a distribution, coupled with a redemption, may be subjected, and it may fall within the statute even in the absence of those elements. The statute invites scrutiny of the time and manner of the cancellation or redemption of stock. It makes no requirement that the issuance and redemption be related; indeed, under its terms, the manner of the issuance (whether or not as a dividend) is not material. Consequently, we must also scrutinize the redemption and distribution with respect to the time and manner when they occur, and the circumstances surrounding them at that time. With that in mind, it is quite apparent that a redemption and distribution may fall within the statute although at the time the stock was issued there was no intention to redeem it later as a means of surplus distribution, or plan to avail of such method as a device by which to circumvent the usual tax upon dividends.

See also *George Hyman, supra*, at page 1234, and *Elwood W. Mc-Guire*, 32 B. T. A. 1075. The Circuit Court (7th Cir.), in affirming the latter case reaffirmed this principle, as follows :

Neither artifice, subterfuge or bad faith need be present to bring a transaction within the meaning of the statute here involved for as we read the law

a taxpayer may well act with the utmost good purpose and without evil intent and yet his transactions may in effect be the equivalent of the distribution of a taxable dividend.

In the light of these cases the fact that we are unable to find any relation here between the issuance of the stock to petitioner in 1925 and the redemption of the 843 shares on December 31, 1932, or any "continuing plan" or "artifice" does not determine the matter.

Nor does the fact that the redemption was not pro rata, and affected only the petitioner, take it out of the class of distributions "essentially equivalent" to dividends. *James D. Robinson*, 27 B. T. A. 1018; *Elwood W. McGuire, supra; Leopold Adler*, 30 B. T. A. 897. Neither need distributions to stockholders be pro rata in order to constitute dividends. *Lincoln National Bank, Executor*, 23 B. T. A. 1304; affd., 63 Fed. (2d) 131; *Ennalls Waggaman*, 29 B. T. A. 473; affd., 78 Fed. (2d) 721; certiorari denied, 296 U. S. 618; *Hugh H. Miller*, 25 B. T. A. 418; dismissed, C. C. A. 2d Cir., August 15, 1933. As we said in *Shelby H. Curlee*, 28 B. T. A. 773, at page 782, it is not necessary that a redemption to come within the definition of subsection (g) must meet all the legal requirements of a regular dividend. Nor would the distribution's similarity be destroyed if it were greater than the company's earnings. *George Hyman, supra*. Nor does it matter that the stock redeemed was held in the company's treasury and not canceled; *James D. Robinson, supra*. And we have held that the return of stock by a stockholder to the corporation in consideration of the cancellation of his debt constitutes a taxable dividend, *William C. Huntoon*, 14 B. T. A. 459; General Counsel Memorandum 11304, C. B. XII–1, p. 135.

The respondent, while admitting that no relation exists between the stock issuance and its redemption in 1932, finds the explanation of the transaction in December 1932 in the conference which took place in 1932 between the company's bookkeeper and the internal revenue agent in Baltimore, when the latter contended that certain withdrawals made by the petitioner in 1929 and in 1930, similar in all respects to the ones involved in this case, constituted dividends taxable to petitioner in those years. The controversy respecting 1929 income was settled through the correction of an error in bookkeeping which is set out in our findings, but it was conceded by petitioner as to the 1930 withdrawals that they were, in fact, an "informal dividend" and the sum of $13,388.84 was consequently charged on the books of the company as such, and petitioner paid tax on it as a dividend. Petitioner urges that the redemption was motivated by a business purpose. Where both the issuance and the subsequent redemption of stock were dictated by legitimate business purposes, as, for example, where there was an expansion of the corporation's

business and a subsequent contraction of its business necessitating a change in its capital structure, we have held in numerous cases that proof of such facts will remove the redemption from the effect of subsection (g) ; *T. Pierre Champion, supra; Alfred E. Fuhlage*, 32 B. T. A. 222; *George A. Lembcke*, 33 B. T. A. 700. Cf. *Commissioner* v. *Quackenbos*, 78 Fed. (2d) 156; *Commissioner* v. *Cordingly*, 78 Fed. (2d) 118. But petitioner has shown no necessity existing in 1932 for contracting the company's business. In fact, in March of that year, by an amendment to its charter, the company was empowered to carry on many new functions not originally contemplated, such as the sale of agricultural products, etc.; a fact which certainly does not support the contention of a contracting business. It is true that the company's gross sales had fallen off sharply from 1931 and that it did not recover its 1932 position until 1934, but in that period of general economic depression this was probably true of most businesses. The petitioner's contention rests solely on the demands which were being made on the company in 1932 by the banks which had lent it money.

In the light of these contentions let us consider briefly the history of the corporation and petitioner's relation to it, with special emphasis, of course, on the facts involved in petitioner's transfer of stock to the corporation in 1932.

Petitioner had complete control of the corporation from the beginning. This, in itself, is not decisive, cf. *Pearl B. Brown, supra; T. Pierre Champion, supra;* but it is nevertheless a significant fact which must not be lost sight of. On December 31, 1932, when the redemption took place, petitioner held 2,910 shares and the two other officers and directors 45 shares each. Exercising the complete control of the company's policy which he did, petitioner found it convenient to borrow large sums from the corporation. At the end of 1929 his debt was $66,679.22, the cancellation of which in 1932, in lieu of the returned 843 shares, is here in question. This sum had risen to nearly $80,000 by the end of the next year, 1930, and had soared to over $95,000 by the end of 1931. Throughout this period the company's earnings had been substantial, varying from over $26,000 in 1925 to nearly $35,000 in 1928. The next year saw a drop to $24,000, and a still further drop to $16,000 in 1930, which rose again to $19,000 in 1931, only to fall to a new low of $5,000 in 1932.

Throughout this period of the company's substantial earnings and of large withdrawals by petitioner, very few dividends were declared. This is a fact of the first importance, for a survey of the cases clearly shows that the regularity of cash dividend distributions has been more than once dwelt upon by this Board and the courts as demonstrating that a particular stock redemption did not have a dividend

character. Cf. *Henry B. Babson, supra,* at pages 861–870; *T. Pierre Champion, supra:* "Such a record is not compatible with a studied intent to avoid tax." (P. 1320.) Here only two formal cash dividends were made, the one a 10 percent dividend of $30,000 on December 10, 1929, and the other a 3 percent dividend of $9,000 on December 31, 1932. The accumulated surplus as shown on the company's books was $65,167.91 by December 31, 1932. However, the minutes of the board of directors of the corporation on December 31, 1932, state definitely that the company had "a surplus in excess of the purchase price of said shares", which was $66,679.22. The only dividend other than the two already mentioned was the "informal" dividend of $13,388.34 entered on the books in 1932, but as of December 31, 1930, the reason for which has already been set out. It was a withdrawal by petitioner, treated by the Commissioner as a taxable dividend, conceded by petitioner to be such, and, therefore, afterwards entered on the books as an "informal" distribution.

The petitioner, who was a majority stockholder, and to all intents and purposes sole stockholder, made a practice of availing himself during the period from 1926 to 1932 of the accumulated earnings of the corporation by the indirect method of borrowing, and borrowing without even the formality of interest paid on the open account or on such part of his debt as was covered by notes. At the same time we see the company possessed on December 31, 1932, of a substantial surplus, but making very few distributions of it by way of cash dividends. At this juncture, on December 31, 1932, petitioner surrendered 843 shares of his stock to the company and had his 1929 debit balance of $66,679.22 canceled. He had owned 2,910 shares of a total 3,000; he now owned 2,067 of a total 2,157. His position as majority stockholder had not changed materially.

With regard to the contention of petitioner that the transaction directly involved here was solely motivated by pressure from the banks, these facts are pertinent.

At the end of 1930 and again at the end of 1931 the company had no outstanding indebtedness. In February 1932 it obtained a loan of $25,000 from a Baltimore bank and another loan of the same amount from another Baltimore bank in May. Notes were given by the company for these loans, which petitioner endorsed. No pressure for repayment was made by the banks in the summer of 1932, but, petitioner testified, the Equitable Trust Co., which held one of the notes, called him up several times in the fall of that year and asked for payment. The note payable to this bank was, accordingly, curtailed by $5,000 in November and renewed. It was paid off in March 1933, and the other note, payable to the Union Trust Co., was paid in May, so that after May 1933 the company owed no money. It borrowed

no more until November 1933. The only evidence of any "pressure" being brought to bear by the banks on the company is petitioner's testimony that one of the banks called him up several times, and that it regarded unfavorably his large debt to the company. Petitioner, it should be recalled, was endorser on the company's notes, and was himself solvent, and considered the company solvent without regard to his indebtedness. There is no evidence of any demand for the reduction of capital, nor is it shown how the company's financial condition would be bettered by such a reduction. We are unable to see how the company was so financially distressed in 1932, able as it was to pay off its loans out of earnings in 1933, that it would have found it necessary to heed the bank's indefinite suggestions in 1932. In support of this argument, petitioner relies strongly on *Harry A. Koch, supra.* The following quotation from our opinion in that case sufficiently well states the facts and indicates the wide divergence of the situation there considered from that present here.

The purpose is made clear by the evidence. In 1928 the corporation owed the First National Bank of Omaha about $149,000 on loans. The bank was dissatisfied with the financial statement rendered to support the loan and insisted that it be improved by a reduction of the corporation's outstanding capital stock by $38,000. To comply with this demand, and for no other reason, the corporation adjusted its capital structure in the manner set forth in our findings, which change satisfied the bank in every particular and enabled the corporation to continue its line of credit with the bank.

The habit of petitioner's withdrawing regularly large sums from the corporation, coupled with the sparseness of its cash dividends, notwithstanding an ample surplus in each year up to 1932; the failure to show any reason for the company's contracting its capital account at a time when its charter amendment might suggest, on the contrary, an expansion of the business; the failure to show any business advantage to the company from such a redemption; the failure to show any serious, or even any financial embarrassment other than such as might result from a general reduction of its business, a situation readily attributable to the general economic depression; the failure to show any pressure by its bank creditors to alter the capital structure of the company or its inability to meet its obligations to them without such alteration; the failure, in short, on the part of petitioner to put forward any convincing affirmative reason for the redemption other than the motive apparent on the record of tax evasion, convinces us that the redemption of the 843 shares of the Natwick Co.'s stock on December 31, 1932, was essentially equivalent to a taxable dividend within the meaning of section 115 (g) and should be, accordingly, so treated.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*