A. C. Monk v. Commissioner.
Monk v. Commissioner
Docket No. 9511.
United States Tax Court
1947 Tax Ct. Memo LEXIS 98; 6 T.C.M. (CCH) 1015; T.C.M. (RIA) 47247; August 28, 1947
J. Gilmer Korner, Jr., Esq., Transportation Bldg., Washington 6, D.C., and Monte Appel, Esq., for the petitioner. E. M. Woolf, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1941 in the sum of $130,654.27. That part of the deficiency which is here in issue resulted from the Commissioner's determination that petitioner realized ordinary income, rather than capital gain, when he transferred to a corporation of which he was president and majority stockholder 235 shares of his stock therein and received $52,847.45 in cash and a credit eliminating his indebtedness to the corporation in the amount of $178,075.30. Findings of Fact A partial stipulation of facts has been filed herein and we find *99 the facts to be as stipulated. Petitioner is an individual residing at Farmville, North Carolina. He kept his accounts and reported his income on a calendar year basis and on the basis of cash receipts and disbursements. He filed his return for 1941 with the collector for the district of North Carolina. A. C. Monk & Co., Inc., hereinafter referred to as the corporation, is a North Carolina corporation organized in 1920. Petitioner has at all times since its organization been president and majority stockholder of the corporation. The corporation is engaged in the business of buying, processing and selling leaf tobacco. Tobacco is bought on the auction markets beginning in Georgia in July and advancing northward as the season progresses, generally closing in December. The tobacco so bought is shipped to the corporation's plants in Farmville and New Bern, North Carolina, where it is processed and stored. During the buying season, many millions of pounds of tobacco are bought by the corporation and large amounts of cash are required for the buying operations since all purchases are immediately paid for in cash. The corporation depends upon bank loans for the money required for this *100 purpose. Its line of credit with the several banks with which it deals is arranged prior to the opening of each buying season and the money is loaned on the unsecured notes of the corporation. These notes are generally paid within the same fiscal year during which they are executed. This corporation has generally secured this borrowed capital at the lowest or prime rate of interest because the banks specializing in tobacco loans have confidence in the standing of the corporation and in the integrity and ability of its officers. The business of the corporation is substantially an export business, such exports comprising more than 60% of its sales. Its export markets are principally in England, China, Holland, Belgium, Germany and the Scandinavian countries. While some sales are made throughout the year, the principal selling season is during the winter, spring and early summer. The officers of the corporation travel abroad, contact the customers and submit samples upon the basis of which sales are made. A branch office is maintained in China from which the Asiatic business is handled. For many years, the practice of the corporation has been to make large bank borrowings during the *101 summer and fall months of the year, during the buying season, and to repay the loans during the later winter and spring months, so that by the close of its fiscal year, June 30, all such loans were discharged. These bank loans are made with several banks and during the fiscal years indicated below have totalled the following amounts: 1934
$ 665,000
1935
545,000
1936
860,000
1937
380,000
1938
492,000
1939
420,000
1940
695,000
1941
775,000
1942
1943
685,000
1944
2,085,000
1945
3,175,000
The fiscal year ended June 30, 1940, was a prosperous year for the corporation. However, in April of 1940, and prior thereto, the petitioner individually was engaged in a serious dispute with the Government over his income tax liability for the years 1931 to 1936. The Commissioner of Internal Revenue had determined deficiencies approximating $200,000 in amount, and had referred the case to the Department of Justice for consideration of indictment. A compromise settlement was arranged which involved the payment of three or four thousand dollars to the State of North Carolina and $196,877.30 to the Federal government in full settlement of all civil liabilities, and *102 pleading guilty to one count of an indictment. It was necessary that the terms of such a settlement be met within a few days and that the $196,877.30 be taken to Washington. The situation was in the nature of an emergency which caused the officers and directors of the corporation deep concern. They believed it to be of the greatest importance to the corporation that the matter be settled and disposed of with the least possible publicity since any adverse public notice of the personal difficulties of petitioner would, it was felt, react immediately and unfavorably on the corporation which had his name, and specifically, that it would affect the credit position of the corporation with its banks. Petitioner did not have the money and it was agreed that the corporation would lend him $200,000 with which to carry out the terms of the proposed settlement. The loan was thereupon made and was evidenced by an interest-bearing demand note. All of the proceeds of the loan were used in the settlement of petitioner's tax liability. The matter was closed in due course and entirely without publicity. None of the company's several bankers ever knew of the case until about the time of the hearing in *103 this case, nearly seven years later. Petitioner had an open account with the corporation for a number of years, and, generally speaking, he repaid all advances made to him by the corporation within the fiscal year in which they were made. None of such advances was ever discharged by the surrender of stock. On a number of occasions (aside from the one involved here) petitioner had also borrowed money from the corporation on his personal note and all such notes were paid in cash within the same fiscal year during which they were made. None was ever discharged by the surrender of stock and there was in 1940 no agreement or intention whatever that petitioner would discharge the loan involved here by the surrender of stock. He made the following payments in cash on the note, which payments were noted on the back of the instrument: November 22, 1940
$20,000.00
December 31, 1940
14,100.00
June 30, 1941
7,824.70
Total
$41,924.70 He also paid interest on the note in the following amounts at the times indicated: June 30, 1940
$ 533.30
June 30, 1941
2,751.90
Late in 1941 petitioner borrowed $20,000 from the corporation, which was charged to his account. *104 As the result of these developments, petitioner, as of October, 1941, owed the corporation a balance of $158,075.30 on the note and $20,000 on open account. As of the end of the 1940 fiscal year the loan of $200,000, which appeared on the balance sheet of the corporation, was the subject of unfavorable reaction in each of the creditor banks, but because business conditions were good and the banks had developed considerable confidence in the corporate management over the years no steps were taken with respect to the item, except that two of the banks called on the officers of the corporation and suggested to them the undesirability of the situation. Petitioner personally assured at least one of the bankers that he was going to take care of this debt and get it paid off. Following that, he made the payments referred to above. During the first six months of its next fiscal year of 1941 (the fall and winter months of 1940) the corporation borrowed $775,000 on its unsecured notes, as usual, expecting to pay them off during the selling season of the same year. But by the spring of 1941, the wars in Europe and Asia had resulted in completely cutting off the foreign market for tobacco. *105 This corporation's business was suddenly reduced by 60%. The tobacco crop was one of the largest in history and this fact, coupled with the elimination of foreign markets, glutted and completely demoralized the domestic market. The corporation was unable to sell its huge inventory and for the first time in many years was unable to pay its notes as they matured. The situation, as of the end of the 1941 fiscal year, was chaotic in the extreme, and the corporation was in a critical condition. In June petitioner and other officers of the corporation went to the banks, explained the unprecedented predicament of the corporation (a condition which prevailed generally in the industry and with which the banks were familiar) and asked for extension of the notes. The several banks thereafter held a conference with the view to working out the terms of some arrangement to enable the corporation to carry on until it could liquidate some of its inventory. They unanimously deplored the continued existence of petitioner's debt to the corporation and indicated to petitioner and the other officers that they regarded it as "very significant," "not in accordance with good business," "a danger sign" with *106 "bad implications," and that such a condition was generally regarded as sufficient justification for banks to refuse loans. The banks reminded the officers of their objection to this item in the 1940 statement and impressed upon them that the banks "wanted that thing cleared up." The proposal finally made by the banks was that they would renew the notes under these conditions: (1) that interest would be charged at the rate of 2 1/2% instead of 1 1/2% for the period of the extension; (2) that certain contingent tax liability of the corporation be resolved and disposed of; (3) that the debt of A. C. Monk to the corporation be discharged and cleared up; (4) that A. C. Monk would personally endorse the corporate notes; (5) that the corporation would pay no dividends; (6) that the corporation would buy no more tobacco for its own account; (7) that the corporation's inventory was to be sold as rapidly as possible at a loss, if necessary; (8) that all moneys so realized be applied to the bank loans, pro rata; (9) that the bank balances of the corporation were to be held for the joint benefit of the creditor banks; (10) that A. C. Monk would make no further borrowings *107 from the corporation. These were regarded as extremely severe terms, effectively preventing the corporation from engaging in profitable business, but the officers considered that they had no choice but to accept them. It was the officers' view that the company was virtually in the hands of the bankers. They, therefore, accepted and agreed to perform all of the conditions specified. They set about immediately to dispose of the inventory and, due largely to the fortuitous entry into the market at about that time of the Commodity Credit Corporation, they were able within a short time to sell enough of its tobacco, at a sacrifice of profit, to pay off all its loans to the bank. Throughout that period pressure was being exerted upon petitioner individually by the bankers, directly and through other officers, to get his debt to the corporation straightened up. One of the bankers suggested very strenuously to the secretary and second largest stockholder of the corporation that petitioner ought to sell some of his stock and pay off the debt. The secretary advised petitioner of this banker's suggestion and urged him to act upon it. Petitioner told the secretary that he was going to pay *108 the debt, but that he could only discharge it as fast as his salary and dividends would permit. The secretary objected that it might drag along for several years in that event and that it was most objectionable to the bankers; he asked if petitioner would not consider selling some of his stock to the corporation so that they would have a clean balance sheet for the bankers. Petitioner replied that he did not want to part with any of his stock, but that he would think about it and let the secretary know. Petitioner discussed the suggestion with his son and with an old friend and advisor, a banker who was not a creditor of the corporation, expressing to each his reluctance to sell the stock, and both urged him to do so. By this time the corporation had paid off its notes, but the officers were aware of the extent to which they would be dependent on bank credit in the future and they were anxious to carry out their agreement with the banks to the letter. They felt that if petitioner's loan were not liquidated before the presentation of their next financial statement to the banks the credit of the corporation might be impaired and they might be denied the low rate of interest which they *109 had theretofore enjoyed. Petitioner decided he should follow the suggestion which the banker had made and a meeting of the board of directors was called, at which petitioner offered to sell to the corporation a sufficient number of shares to liquidate his indebtedness and to give him a sufficient amount above that to pay his tax liability resulting from the transaction. A resolution was adopted authorizing the purchase of 235 shares of petitioner's stock at $982.65 per share. This was the book value of the stock at the time the last preceding annual audit was made. The resolution provided for the adjustment up or down of the number of shares to be transferred by petitioner, and the price to be paid by the corporation if, in the computation of the tax consequences of the transaction to either the corporation or petitioner, the Commissioner of Internal Revenue should determine a value different from the book value used. Petitioner thereupon transferred 235 shares of his stock to the corporation and received therefor $230,922.75 by way of credits for $178,075.30 on petitioner's note and debt and $52,847.45 in cash. Petitioner's tax basis for the stock which he had acquired on and *110 held continuously from July 1, 1921, was $100 per share. He computed and reported a tax liability on the basis of a long-term capital gain resulting in a tax paid of $31,113.34 to the Federal government and $14,519.59 to the State of North Carolina. A new certificate for 235 shares was issued in the corporate name and was placed in a portfolio containing other stocks owned by the corporation. It is held as treasury stock. Before transferring these shares petitioner owned 52.8% of the outstanding corporate stock, including treasury stock; after the transfer he owned 43.2%. Of the stock held by persons other than the issuing corporation he held 69.8% before the transfer of 235 shares to the corporation; afterwards he held 64.7% thereof. The corporation has never issued a stock dividend. It has paid cash dividends as follows: Dividend
1935
50%
$126,000.00
1936
15%
37,800.00
1937
30%
50,400.00
1938
25%
48,550.00
1939
20%
38,840.00
1940
20%
38,840.00
1941
1942
37 1/2%
65,712.50
The salary paid to petitioner as president of the corporation during the years indicated was as follows: 1938
$25,000.00
1939
30,000.00
1940
35,000.00
1941
24,999.96
1942
24,999.96
*111 The balance sheets of petitioner as of June 30, 1941, and June 30, 1942, were as follows: June 30, 1941
June 30, 1942
Assets
Cash
$ 294,654.15
$ 456,150.52
Accounts Receivable
55,747.79
50,856.90
Notes
160,123.71
619.84
Inventories
1,787,031.60
1,121,892.52
Fixed Assets - Depreciated Value
145,429.91
147,582.02
Investments: Subsidiary Co.
$124,761.90
$ 124,761.90
Stocks - Domestic Corps.
61,935.37
61,935.37
U.S. War Savings Bonds
186,697.27
202,237.27
Cash Value - Life Insurance
44,571.65
51,146.95
Deferred Charges
11,399.76
10,516.05
Totals
$2,696,332.12
$2,051,678.35
Liabilities and Net Worth
Accounts Payable: Current Expenses
$ 11,666.66
$ 18,543.36
Monk-Henderson Tob. Co.
17,763.43
Officers and Employees
19,198.59
30,158.11
Foreign Credit Balances
227.12
$ 48,855.80
227.12
$ 48,928.59
Notes Payable
775,000.00
Accrued Taxes
12,669.09
8,339.27
Customers' Deposits
27,161.21
28,561.21
Reserve for Shanghal Liabilities
17,956.73
Federal and State Income Taxes
90,595.33
Net Worth: Capital Stock - Common
$ 186,500.00
$ 162,700.00
Earned Surplus
1,620,082.41
1,668,533.61
Paid-in Surplus
26,063.61
26,063.61
Total Net Worth
$1,832,646.02
$1,857,297.22
Totals
$2,696,332.12
$2,051,678.35
*112 The transaction here in question was not in whole, or in part, essentially equivalent to the distribution of a taxable dividend. Opinion KERN, Judge: The only question presented is whether respondent erred in determining that petitioner realized ordinary income, rather than capital gain, in the year 1941 as the result of his transfer to the corporation of which he was president and principal stockholder of 235 shares of common stock, and the elimination of his indebtedness to the corporation and the receipt by him of some cash, totaling $230,922.75. It is the respondent's position that the amount which petitioner received should be treated as a taxable dividend under the provisions of section 115 (g) of the Internal Revenue Code, which provides insofar as is here pertinent: "If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents *113 a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend." The respondent has, by section 19.115-9 of Regulations 103, recognized the fact that whether such a distribution is essentially equivalent to a taxable dividend depends upon the circumstances of each case; and this thought has been expressed in most of the cases involving this question. The respondent relies on the presumption of correctness which his determination carries and, among other authorities, chiefly upon J. Natwick, 36 B.T.A. 866, George Hyman, 28 B.T.A. 1231, affd. 71 Fed. (2d) 342, cert. den. 293 U.S. 570. A. E. Levit, et al., 43 B.T.A. 1077; L. B. Hirsch, 42 B.T.A. 566; and Pullman, Inc., 8 T.C. 292. Numerous criteria have been established as the evolutionary result of decisions dealing with this question over a long period of time and from diverse approaches. It is only for the purpose of making the appropriate comparison or contrasts that any detailed discussion of the cases will be undertaken here. The petitioner points out that the stock here in question *114 was part of the corporation's original issue, and was not issued as a stock dividend; that it was not, in fact, cancelled but was carried as treasury stock, subject to resale or reissue; that the payment by the corporation was not made pro rata to all stockholders; that petitioner's stock holdings were reduced from 52.8% of total outstanding shares to 43.2% by the transfer involved; that substantial cash dividends had been paid every year except the year involved here when the banks required that no dividends be paid; that the petitioner had always paid off his previous loans from the corporation in cash and intended to pay and was engaged in paying this one in that manner when the banks became insistent that it be immediately settled as one of the several conditions of extending the corporation's loans; that borrowed capital was the very life blood of this corporation's existence, and when it defaulted in the payment of its bank loans due to market conditions, its future was in the hands of the banks which were in position to dictate any policy which they desired; that the sale of the stock in question was suggested by a bank official, and insisted upon by other corporate officers, *115 and only reluctantly agreed to by petitioner; and that the stock was purchased by the corporation at its fair value, being its book value as of that date. Petitioner relies largely on Harry A. Koch, 26 B.T.A. 1025; Bona Allen, Jr., 41 B.T.A. 206; and R. W. Creech, 46 B.T.A. 93. These cases present marked similarities to the facts presently before us, and seem to point the way to a holding for the petitioner in this case. The Bona Allen case is perhaps the closest analogy, but unlike the situation there, the stock here was not issued as a dividend, the corporation's cash dividend record here was much more liberal, the distribution was not pro rata, and the corporation's financial dilemma was much more critical because of world market conditions, so that the banks had virtually "life or death" control over corporate affairs. The case of J. Natwick, supra, so heavily relied on by respondent, is readily distinguishable by these differences: the taxpayer there was virtually the sole stockholder; the company had substantial earnings, but had paid dividends in only two years; the taxpayer regularly borrowed sums of money from the corporate *116 funds, on which he paid no interest. In one year prior to the tax year the taxpayer agreed to the treatment of his withdrawals as taxable dividends. He executed a non-interest-bearing note in the amount of the balance due on his loan at the end of 1929, and in 1932, surrendered 843 shares of stock in cancellation of that note and the indebtedness which it evidenced. This procedure was not specifically recommended by any creditor of the corporation and took place while his tax liability for 1929 was under investigation by the government. The price decided upon for the stock was the cost to the taxpayer of $79, not its then value of $99. The entire atmosphere surrounding the Natwick case is so different from that with which we are here concerned that it is not particularly helpful as a precedent. In A. E. Levit, supra, also cited by respondent, the initiative for the redemption involved there originated with the stockholders who wished to utilize that method of retiring their debts, and the redemption was pro rata. In L. B. Hirsch, supra, the redemption was suggested by accountants who represented brokers engaged in marketing the corporation's commercial *117 paper. There was no showing that the corporation owed any money to the brokers which would give their suggestions any more than advisory weight. No dividends had been paid for 7 years and the offer of redemption was extended to all stockholders alike. George Hyman, supra, involved a taxpayer who was virtually the sole stockholder of a corporation with a large earned surplus, which redeemed and cancelled 97 1/2% of its stock, all owned by him, at par. The distribution was held to be essentially equivalent to a taxable dividend to the extent of the surplus. In the case of Pullman, Inc., the initiative of the transaction came from the stockholder; the proportionate interest of the stockholder was in no way affected; the purported price fixed for the stock surrendered had no relation to its value; and no business purpose of the corporation was served by the transaction except the distribution of unneeded cash surplus to its sole stockholder. It may truly be said, as respondent does, that the fact that there is no apparent relationship between the issuance of the stock and its redemption is not decisive, Annie Watts Hill, 27 B.T.A. 73 affd. 66 Fed. (2d) 45; *118 that bad faith is neither necessary nor implied and good faith is not determinative, McGuire v. Commissioner, 84 Fed. (2d) 431, cert. den. 299 U.S. 591; that the redemption need not be pro rata, James D. Robinson, 27 B.T.A. 1018; Elwood W. McGuire, supra; Leopold Adler, 30 B.T.A. 897; and that the fact the stock was not cancelled but held as treasury stock is not conclusive, James D. Robinson, supra. No one element is of conclusive importance, but the confluence of all these factors in a single situation, plus the regular distribution of cash dividends of from 15% to 50%; the considerable though not drastic reduction of the petitioner's proportionate stock interest which will reflect itself notably in future dividend distributions; the origin of the initiative for the redemption in the creditor banks and the reluctance of petitioner to agree to it; the importance to the corporation of the result achieved; the payment for the stock at book value, which was greatly in excess of petitioner's cost; the fact that no stock dividends had ever been distributed by the corporation; the prior history of petitioner's *119 repayment in cash each year of loans obtained from the corporation; plus the peculiar and compelling background of this case, all seem to us to place it well beyond the intended orbit of section 115 (g). We, therefore, conclude the redemption of petitioner's stock did not take place at such a time and in such manner as to make the distribution essentially equivalent to a taxable dividend, and decide the issue before us in favor of petitioner. Decision will be entered under Rule 50.