W. & K. HOLDING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HERMAN KNOBLOCH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WESLEY E. KNOBLOCH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HARVEY W. PEACE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DAVID C. KNOBLOCH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 81216, 87275, 87276, 87277, 87278.   Promulgated October 12, 1938.

831

*Milton M. Davis, Esq.*, for the petitioners.
*J. R. Johnston, Esq.*, for the respondent.

OPINION.

MURDOCK:

*Issue I.—Sale by W. & K. of Securities Acquired from Its Stockholders in Exchange for Preferred Stock.*

The petitioner, W. & K., contends that it is entitled to use as its basis for gain or loss on the disposition of the securities the cost of those securities to its stockholders because the property was acquired in an exchange of the kind described in section 112 (b) (5) of the Revenue Act of 1932. The statutory provision is as follows:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

\*      \*      \*      \*      \*      \*      \*

(b) EXCHANGES SOLELY IN KIND.—

\*      \*      \*      \*      \*      \*      \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior. to the exchange.

Every element necessary under the above provision is present here. See also section 112 (j) as to control.

The Commissioner argues, however, that since this transaction was carried out for the purpose of minimizing taxes, since it had no real business purpose, and since it was followed by a redemption of the preferred stock, it should be treated as a taxable transaction giving the property a new basis in the hands of W. & K., citing *Gregory* v. *Helvering*, 293 U. S. 465. The question in the *Gregory* case was whether or not there was a nontaxable reorganization. No such question is involved in this issue. This was an exchange, not a reorganization. The *Gregory* case does not support the Commissioner's contention. Cf. *George W. Griffiths*, 37 B. T. A. 314.

Here there was an exchange and no substantial change occurred in the beneficial ownership and control of the property beyond the change from individual to corporate ownership. *Snead* v. *Jackson Securities Co.*, 77 Fed. (2d) 19. The loss of the stockholders was therefore postponed under the statute. The transaction was not a sale with payment deferred. The transferors had no right to any purchase price. Their rights were those of stockholders. Cf. *Newman, Saunders & Co.* v. *United States*, 36 Fed. (2d) 1009; certiorari denied, 281 U. S. 760; *Osburn California Co.* v. *Welch*, 39 Fed. (2d)

41; certiorari denied, 282 U. S. 850; *American Compress & Warehouse Co.* v. *Bender*, 70 Fed. (2d) 655; *T. W. Phillips, Jr., Inc.*, 23 B. T. A. 1272; affd., 63 Fed. (2d) 101. The expectation of redemption is the only new circumstance. But it was a mere expectation, not an agreement. There was no debt due from the corporation to the preferred stockholders and no obligation to retire the preferred stock. The redemption was subject to claims of all creditors. The stock was actually retired in the next fiscal year, but the exchange is not dependent upon what happened that long afterward.

The exchange was within the provisions of section 112 (b) (5). Therefore, 113 (a) (8) applies and the basis for W. & K. was the same as that of the transferors. Section 101 (c) (8) (B) also applies and makes the loss a capital loss. That being so, section 23 (r) does not apply. The Commissioner erred as the petitioner contends.

### Issue II.—Redemption of Common Stock by W. & K.

The Commissioner has held, as to each individual petitioner, that the retirement of the common stock was "at such time and in such manner as to make the distribution and * * * redemption in whole * * * essentially equivalent to the distribution of a taxable dividend." Six hundred and fourteen of the 1,000 shares outstanding were retired at $300 per share. The total amount distributed was $184,200, consisting of $173,100 paid on January 3 and $11,100 paid on October 7, 1933.

That these amounts were actually paid from earnings or profits accumulated after February 28, 1913, can not be seriously controverted on this record. The corporation was not formed until long after February 28, 1913. All of its earnings or profits were accumulated after that date. Its books showed an operating surplus of $31,411.52 at August 1, 1932. That was increased to $189,374.68 upon the sale of the real estate in November 1932. There was also on the books in January 1933 a "capital surplus" of $30,860.59. The amount of accumulated earnings on January 3, 1933, and on October 7, 1933, is not shown. The petitioners had the burden of proof. However, it is clear that the accumulated earnings exceeded the total amounts distributed. The excess was more than sufficient to take care of all uncertainties in this record, as well as all liabilities and losses shown by the record. The loss on the securities allowed under issue I has no effect upon the distribution of January 3, 1933, because the sales were made after that date. Furthermore, that loss and the loss of $12,104.70 involved in issue VI, the date of which is not shown, do not affect earnings available for distribution because they are not, actually and for dividend purposes, losses of the corporation, since they resulted entirely from the fact that the corporation was

merely permitted to use a basis in excess of cost to it for the purpose of computing its taxable income. Earnings available for dividends are computed upon actual gains and losses of the corporation as of the date of the distribution. *Charles F. Ayer*, 12 B. T. A. 284; *R. M. Weyerhaeuser*, 33 B. T. A. 594; *Susan T. Freshman*, 33 B. T. A. 394; *F. J. Young Corporation*, 35 B. T. A. 860.

The petitioners contend that the surplus should be reduced by a reserve of $35,000 for taxes for the fiscal year ended July 31, 1933. The taxes owed for that period were much less than $35,000 and can only be accrued ratably to the distribution date. *Commissioner* v. *James*, 49 Fed. (2d) 707, affirming 13 B. T. A. 764. Due allowance has been made for Federal taxes in our finding that earnings were available. Another contention of the petitioners, that the surplus had to be allocated to all of the 1,000 shares outstanding, is contrary to the clear provision of section 115 (b) which requires only the existence of earnings. Some testimony about depreciation in value of two assets was unimportant because, even if it were convincing, it would account for a reduction of excess surplus only.

The evidence not only fails to show error in the Commissioner's determination as to the effect of this distribution but supports his conclusion. The corporation had an extraordinarily large profit which it desired to distribute to its stockholders. It could have declared a dividend for that purpose. Instead, it distributed its excess funds by redeeming a large block of its stock. The distribution was made in that way so that the stockholders might avoid tax. Cf. *J. Natwick*, 36 B. T. A. 866, as to motive. There was no intention to liquidate. A dividend need not be in direct proportion to stockholdings. However, the relative stock interests of the principal stockholders were not materially changed by the redemption. It is not essential that there be any connection between the issuance and the retirement of the stock or that the stock be canceled instead of held in the treasury. *Annie Watts Hill*, 27 B. T. A. 73; affd., 66 Fed. (2d) 45; *James D. Robinson*, 27 B. T. A. 1018; *J. Natwick, supra*. Since the facts show that this distribution was essentially equivalent to the distribution of a taxable dividend, it follows that the Commissioner did not err.

The transaction was not in liquidation, neither was it a sale, as the petitioners contend. Nor was any reasonable business need accomplished by making the distribution in the form of a retirement rather than as a dividend. Section 115(g) is not unconstitutional merely because it incorporates the presumption of section 115(b) that all distributions are made out of earnings to the extent thereof and from those most recently accumulated. The presumption of (b) has been held constitutional, *Leland* v. *Commissioner*, 50 Fed. (2d) 523, and (g) adds no unconstitutional effect.

*Issue III.—Redemption of Preferred Stock by W. & K.*

The Commissioner gave the preferred shares a basis equal to the fair market value of the property given in exchange for them instead of the cost of that property to the transferors. Since the exchange was a nontaxable one, as held under issue I, it follows that the Commissioner erred. Section 113(a)(6) allows the use of the cost of the property as the basis for the property received in exchange. Even if this gives a double deduction, one to the stockholder and another to the corporation, Congress alone can correct the law.

*Issue IV.—Alleged Loss of Sewat from Disposition of Securities and Alleged Loss of Peace from Exchange of his W. & K. Stock for Flushing Mortgage.*

Sewat claims the right to use, as its basis for gain or loss on the securities acquired from Peace on January 10, $51,171.62, the cost of those securities to Peace. It makes this contention on the ground that the exchange was within section 112(b)(5) and, therefore, section 113(a)(8) applies. This argument is unsound, since the exchange was not within section 112(b)(5). Peace transferred the securities to Sewat as part of an integral plan. Although he momentarily held the stock of Sewat, he was never in control of that corporation. He had to transfer that stock immediately to W. & K. Thus, W. & K., not Peace, was in control of Sewat immediately after the exchange. Control depends upon the situation as it exists upon completion of the plan, not upon the situation existing after one of the intermediate steps. *Wilbur F. Burns*, 30 B. T. A. 163, 172; affd., 85 Fed. (2d) 8; *Charles Hall*, 31 B. T. A. 125.

Sewat was not entitled to use cost to Peace as its basis for gain or loss on the securities, but was entitled to use only the value of those securities at the time of the transfer. That value was $11,154.62. Those securities were exchanged by Sewat for the Flushing mortgage. The principal amount of the mortgage was $10,000. Its fair market value is not shown, although Herman Knobloch acquired it and another mortgage as set forth in the findings. It was worth at least $4,000 and the loss of Sewat could not exceed $7,154.62 ($11,154.62—$4,000). The Commissioner has held that this exchange did not result in any deductible loss. He argues that this particular transaction was but a part of a larger one, the consideration for the whole was divided among the various parts to suit the convenience of the parties and to avoid income taxes, and there was other consideration for the transfer by Sewat of assets worth $11,154.62 for a mortgage worth much less. The evidence strongly supports this contention of

the Commissioner and it fails to show that Sewat sustained any loss which would entitle it to a deduction for income tax purposes. The statute does not mean that parties may obtain deductions in this way through maneuvering puppets. Sewat held the mortgage only long enough to transfer it pursuant to the general plan. This consideration was not the result of dealing at arm's length. The loss was not genuine and real. Cf. *Seymour H. Knox*, 33 B. T. A. 972; *Labrot* v. *Burnet*, 57 Fed. (2d) 413, affirming 18 B. T. A. 332; *Commissioner* v. *Ehrhart*, 82 Fed. (2d) 338; *Shoenberg* v. *Commissioner*, 77 Fed. (2d) 446; certiorari denied, 296 U. S. 586.

Peace claims the right to use $51,154.62, the cost of his securities, as his basis for gain or loss on the 38 shares of W. & K. preferred stock which he received in exchange for those shares. But since the exchange was not within section 112 (b) (5), as previously explained, he can not use that old basis. It follows, however, that he sustained a loss of $40,027.46 on January 10, 1933. He owned on that morning securities which had cost him $51,154.62. He exchanged them and held in their place at the end of the day 38 shares of preferred stock of W. & K., redeemable for $11,127.16. A part of that loss was a capital loss. Proper adjustment may be made under Rule 50.

The 38 shares of W. & K. preferred then had a basis in his hands of $11,127.16. Peace exchanged them, together with 12 shares of common which had cost him $1,550, for the Flushing mortgage, which he valued at $10,000. The Commissioner has held that that transaction was not entered into for profit. The obvious inadequacy of the consideration supports the determination. An individual is allowed such a loss only in case the transaction was entered into for profit. Sec. 23 (e). The Commissioner contends, in addition, that this transaction was only a part of the larger transaction and here, again, there was no real loss. We agree with the Commissioner. Peace had to reduce the bank loan. He could have sold his W. & K. stock, but the Knoblochs did not want outsiders to get that stock and they wanted Sewat to have a loss. The plan was then formed whereby the Knoblochs would satisfy the bank and Peace would transfer his W. & K. stock to Sewat, which was in turn owned by W. & K. Herman Knobloch transferred the Flushing mortgage to Archie Peace without any stated consideration. Archie transferred it to Sewat for assets worth much more than the mortgage. These were family transactions and invite careful scrutiny. The net result was that each family, the Knoblochs and the Peaces, received assets worth substantially the same as those surrendered. No real loss resulted to either, and on this record the action of the Commissioner can not be changed except as already stated. Cf. *Shoenberg* v. *Commissioner, supra; Commissioner* v. *Ehrhart, supra.*

*Issue V.—Loss on Sale of Amsterdam Avenue Mortgage by W. & K.*

The parties have stipulated that the cost of this mortgage to the stockholders was $13,104.70. The stockholders donated the mortgage to W. & K. in November 1932. The mortgage then had a basis for gain or loss to W. & K. of $13,104.70. Sec. 113 (a) (2). The evidence is reasonably clear that the fair market value of the mortgage thereafter was about $1,000. It was sold by W. & K. to Archie Peace, a minority stockholder, for $1,000 during the fiscal year ended July 31, 1933. The evidence indicates that the sale was absolute and an isolated transaction. There is no suggestion that W. & K. ever reacquired the mortgage. W. & K. is entitled to deduct a loss of $12,104.70 on the sale.

*Issue VI.—Constitutionality of Excess Profits Tax.*

W. & K. alleges that "the law under which the respondent attempts to impose an excess profits tax amounting to $3,764.37 is unconstitutional." Sections 215 (a) and (f) and 216 (a), National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, impose a capital stock tax and an excess profits tax on domestic corporations. The capital stock provisions apply only to the year ended June 30, 1933. The profits tax provisions do not apply to any year ending after June 30, 1934. Sec. 703, Revenue Act of 1934. Substantially the same provisions (except as to years) were reenacted in sections 701 and 702 of the Revenue Act of 1934, effective beginning with the year ending June 30, 1934.

Section 215 (a) imposes for each year ending June 30 an excise tax of $1 for each $1,000 of the adjusted declared value of the capital stock. Section 215 (f) provides that for the first year ending June 30 "the adjusted declared value shall be the value, as declared by the corporation in its first return under this section (which declaration of value can not be amended), as of the close of its last income tax taxable year ending at or prior to the close of the year for which the tax is imposed by this section (or as of the date of organization in the case of a corporation having no income tax taxable year ending at or prior to the close of the year for which the tax is imposed by this section.)" There are provisions for increases and reductions of the original declared value for subsequent years, on account of additions and reductions of capital, earnings, distributions, etc., which are similar to the old invested capital provisions of earlier acts, not here material.

Section 216 (a) imposes "upon the net income of every corporation, for each income-tax taxable year ending after the close of the first year in respect of which it is taxable under section 215, an excess-

profits tax equivalent to 5 per centum of such portion of its net income for such income-tax taxable year as is in excess of 12½ per centum of the adjusted declared value of its capital stock  *  *  *  as of the close of the preceding income-tax taxable year  *  *  *  determined as provided in section 215.  *  *  * " The tax imposed by section 216 (a) is subject to the same provisions of law as taxes imposed by Title I, Revenue Act of 1932. The plan of the statute is to permit the taxpayer to declare the value of the capital stock, and, if it makes a low valuation and thereby pays a small capital stock tax, the 12½ percent credited against its net income will be smaller and will result in an increase of the excess profits tax. A high valuation will operate conversely. The statute was designed to avoid administrative difficulty and controversy in valuing the stock. The profits tax permits a reasonable valuation, and the primary purpose was to induce corporations to declare a fair value. *William A. Webster Co.*, 37 B. T. A. 800; Senate Report 114, 73d Cong., 1st sess. p. 6.

Wesley Knobloch testified that the income tax return was made up first, and, as he knew the amount of net income to be $48,244.22, he arbitrarily declared the value of the capital stock of W. & K. at $386,000, so as to escape the profits tax. In other words, he declared it at 8 times the net income. He was familar with the assets and liabilities and the market value of the assets, and expressed the opinion that the fair market value of the stock was $115,000. He does not state how he arrived at this figure.

The amended petition alleges that the profits tax is based upon $397,154.62, an arbitrary and unsound value which petitioners were compelled by section 215 to place on their stock; that amount did not reflect the actual value on June 30, 1933; the law denied to them the right to file an amended return correcting that value; the law does not provide any method by which the value may be computed but delegates to the taxpayer the right arbitrarily to fix it without any basis in fact, an invalid delegation of the lawmaking power; and the law requires doing an act in terms so vague that men must guess at its meaning and differ as to its application, all in violation of the Fifth Amendment. The petitioner argues that section 215 is invalid under the Fifth and Fourteenth Amendments in that it compels payment of a tax based upon an arbitrary and unreasonable amount not easily or accurately ascertainable nor defined within the law itself, not based upon actual facts, but upon a basis prejudicial to taxpayers by reason of its effect upon the tax imposed under section 216. The petitioner relies on *Oertel Co.* v. *Glenn*, 13 Fed. Supp. 651, wherein the United States District Court of Western Kentucky sustained the right to file an amended return. The Commissioner contends that this case supports the validity of the statute, since the right of amendment is not here involved.

Since the briefs were filed, the Board, the Court of Claims, and the Circuit Court for the Sixth Circuit have considered these provisions. The cases are: *Glenn* v. *Oertel Co.*, 97 Fed. (2d) 495; *Chicago Telephone Supply Co.* v. *United States* (Ct. Cls.), 23 Fed. Supp. 471; *William A. Webster Co.*, 37 B. T. A. 800.

It is to be noted that the Commissioner determined an excess profits tax and we are not here concerned with the validity of, nor have we jurisdiction over, capital stock taxes. The Court of Claims in the *Chicago Telephone* case sustained the statute, but stated its validity is not free from doubt. In the *Oertel* case, the District Court held that where the original declared value is understated the taxpayer may file an amended capital stock tax return before the liability for the profits tax accrues. The reasoning of the court is that the capital stock tax is based on the value of the stock, the value must be determined according to the underlying facts, and declared value means actual value. The court further observed that if the tax were levied on a value declared by the taxpayer regardless of actual value, it would be void for uncertainty and would offend the Fifth Amendment. The latter statement is pure dicta, since the court held that the statute was not to be so construed. The case is, therefore, no authority for holding the statute invalid. The Circuit Court of Appeals on June 8, 1938, affirmed the District Court. In construing the statute it held that Congress did not intend that an incorrect invalid return springing from an honest mistake could not be corrected, particularly where the correction was sought within the period for which an extension had been granted. It reasoned that to lay a tax upon the taxpayer's error rather than its income was inconsistent with the purpose to induce declaration of fair and reasonable values. It did not pass on the validity of the law.

The Board in the *Webster* case reached an opposite conclusion from the District Court in the *Oertel* case. The original capital stock tax return was filed and, within the time for filing as extended by the Treasury, the taxpayer sought to file an amended return increasing the value from $395,000 to $800,000. The Board held the statute prohibited amendment in plain terms and refused to accept the reasoning of the *Oertel* case. There is nothing in the facts there to show the reason for the change or that the first return was due to mistake. The constitutionality of the law was not raised.

The *Chicago Telephone* case is the only one in which the constitutional question was decided. The court followed the Board in holding that the statute does not permit amendment. The decision of the court is that the real value was known to and was readily ascertainable by the taxpayer, and the resulting profits tax was not due to arbitrary features of the law, but to the taxpayer's fault in electing to state a fictitious value which it had full opportunity to avoid.

Referring to the statement in the *Oertel* case that the statute, if construed to deny amendment to show real value, would raise a conclusive presumption that an incorrect value shall be used as a measure of the tax, the court held that for the first year the declaration is made, no question of presumption arises, as the taxpayer has an opportunity to ascertain the value and can not be said to have fixed it without evidence or an opportunity to be heard. The court further held that the statute did not involve a delegation by Congress of its lawmaking authority, since a declaration of value is a mere statement of fact; and it answered the objection, that no guide or method was prescribed for making the declaration of value, by saying that there is no necessity for a guide in making a statement of fact. The court seemed to think that, if a declaration for a previous year were used in a later year, it might be arbitrary to make the declaration conclusive, but that case, like the present one, involved use of the declaration only in the first year.

The decision of the Court of Claims is a complete answer to the petitioner's contentions. The petitioner here is in a less favorable position than the taxpayer in that case. Here, with full knowledge of the facts as to value and of its net income, the petitioner made what is now claimed to be a grossly excessive declaration expressly intended to wipe out any profits tax. The effect of its action is that it has secured the benefit of a lower tax than it would have had to pay if it had made a lower valuation. Its claim is not now directed to the right to amend to show the actual value, but it seeks to strike down the whole taxing statute as void for failure to set a guide for the declaration of value.

There is nothing in the statute which prohibits a taxpayer from declaring the actual value. Congress did not intend that a corporation should declare a value sufficiently high to wipe out all profits taxes, for the purpose is to tax profits in excess of the credit of 12½ percent. One of the objects is to tax at higher rates abnormal profits which are out of proportion to the capital. In the case of the Sewat Co., the declared value was based on the value of assets acquired for stock.

If the District and Circuit Court in the *Oertel* case are right in holding that the statute contemplates a tax only on actual value of the capital stock, that construction gives taxpayers a standard or guide. It would then follow in this case that if the capital stock tax was invalid as being based on an excessive value (it is not here involved), the profits tax was less than what it would have been if computed on actual value. Hence, the petitioner suffered no injury or damage when the Government applied the tax on the basis of its excessive valuation. The petitioner in such case could not attack the constitutionality of the profits tax. The rule is that "one who invokes the

power to declare a statute unconstitutional must show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Massachusetts* v. *Mellon*, 262 U. S. 447, 488. See also *Heald* v. *District of Columbia*, 259 U. S. 114, 124.

On the facts in this case a claim of the right to file an amended return would avail the petitioner nothing. The petitioner's contention is without merit.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

TURNER, dissenting: It is true, as the majority opinion points out, that the question in *Gregory* v. *Helvering*, 293 U. S. 465, was whether the transfer by one corporation of a part of its assets to another corporation for all of the stock of the latter was a reorganization within the meaning of section 112 (i) of the Revenue Act of 1928 and the question in issue I of the instant case is whether the transfer of securities by three individuals to a corporation for preferred stock was a transfer within the meaning of section 112 (b) (5) of that act, but the distinction drawn is in my opinion a distinction without a difference in so far as the application of the statute is concerned. The only concern or purpose in applying any provision of the statute is to determine the tax effect, and the tax effect of compliance in any transaction with either of the above provisions of the statute is obviously a point of similarity and not of distinction and is that the gain or loss realized or sustained in the particular transaction is not to be recognized until the subsequent disposition of the stock acquired. Accordingly, the distinction that may be drawn between the exchange in *Gregory* v. *Helvering* and the exchange in the instant case, which is a distinction as to the form of the transactions and not as to tax effect, is of no significance because admittedly in both transactions there was literal compliance with the statute.

A provision corresponding to section 112 (b) (5) first appeared in the Revenue Act of 1921. The Committee on Ways and Means, in reporting the bill which was later enacted as the Revenue Act of 1921, said that the provision "if adopted, will by removing a source of grave uncertainty, not only permit business to go forward with the adjustments required by existing conditions but will also considerably increase the revenue by preventing taxpayers from taking colorable losses in wash sales and other fictitious exchanges." It is thus apparent that Congress had in mind only actual and real busi-

ness transactions when it inserted the provisions under consideration in the income tax statutes. Furthermore, it anticipated that taxpayers indulging in fictitious exchanges would not be given the benefit of the statute.

In the Revenue Act of 1924 Congress, for the first time, separated and grouped in one section the provisions of the statute dealing with the recognition of gain or loss realized or sustained on exchanges of property. That part of the definition of the term "reorganization" construed in *Gregory* v. *Helvering* made its first appearance in that act. Reporting the measure to the House of Representatives, the Committee on Ways and Means stated: "It appears best to provide generally that gain or loss is recognized from all exchanges and then except specifically and in definite terms those cases of exchange in which it is not desired to tax the gain or allow the loss." In a later paragraph of the report the Committee stated that Congress had theretofore "adopted the policy of exempting from tax the gain from exchanges made in connection with a reorganization in order that ordinary business transactions will not be prevented on account of the provisions of the tax law." Among the exceptions to the general rule that gain or loss from all exchanges should be recognized and stated in identical terms were the exceptions stated in section 112 (b) (5) of the 1928 Act, with which we are here concerned, and in that part of section 112 (i), which was construed by the Supreme Court in *Gregory* v. *Helvering*. The exceptions are all on a basis of equality and certainly nothing is apparent to indicate that Congress had any thought or intention that literal compliance with one of the excepted provisions was sufficient to prevent recognition of gain while in the other it should be necessary that the exchange meet the requirements of the statute not only as to form, but also that it should have an actual and real business purpose. In applying section 112 (i) the Supreme Court, in *Gregory* v. *Helvering*, held that it was not enough that a transaction fall literally within the terms of the statute, and concluded that a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either corporation was "outside the plain intent of the statute."

I am unable to find any basis for holding that Congress actually did or intended to deal less strictly with taxpayers who seek to bring their transactions within the terms of section 112 (b) (5) than with those who seek to apply the terms of section 112 (i). Such, however, is the effect of the distinction drawn between *Gregory* v. *Helvering* and the instant case. To so hold is to say to taxpayers that gain realized on an exchange which meets the literal requirements

of section 112 (b) (5) is not to be recognized even though the transfer has no relation to the business of either the transferor or transferee. But if the gain realized in a transaction described in section 112 (i) is to escape recognition, the transaction must not only satisfy that section as to formalities but must also serve a real business purpose. In my opinion Congress made no such distinction and the presence of a real business purpose is a prerequisite to the applicability of section 112 (b) (5) just as it is with section 112 (i).

As I read the facts, the transaction in this case, as in *Gregory* v. *Helvering*, served a tax purpose and not a business purpose. The securities were transferred to W. & K. for the sole purpose of permitting that corporation to apply the loss, which would result from their sale, against gain which it was known the corporation would realize during the taxable year in the course of its regular business. The retirement of the preferred stock was provided for at the time of the exchange and the retirement price was fixed at $292.82, an amount which was to the penny equivalent to the prorated fair market value of the securities transferred. The final sale of securities occurred on July 28, 1933, and on October 6, 1933, the preferred stock was retired with the proceeds of the sale. The facts and circumstances in my opinion indicate that there was no intention that the corporation would use the securities in its business or retain the proceeds for such use after the securities were sold and show that the transfer of the securities by the three petitioners to the W. & K. Holding Corporation was "not a transfer of assets * * * in pursuance of a plan having relation to the business" of either the transferors or the transferee. "The transaction upon its face lies outside the plain intent of the statute."

For the reasons outlined, I respectfully express my dissent.

ARNOLD, DISNEY, and OPPER agree with this dissent.