**ROCHESTER GAS & ELECTRIC CORPORATION v. McGOWAN, and three other cases.**

**Nos. 80, 43, 78, 79.**

Circuit Court of Appeals, Second Circuit.

Dec. 2, 1940.

W. H. Annat, of Cleveland, Ohio, for Hornell Ice & Cold Storage Co.

Scott Stewart, Jr., of Rochester, N. Y., for Stromberg-Carlson Telephone Mfg. Co. et al.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Paul S. McMahon, Sp. Assts. to Atty. Gen. (George L. Grobe, U. S. Atty., and Joseph J. Doran, Asst. U. S. Atty., both of Buffalo, N. Y., of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These actions were brought to recover "capital stock taxes" paid by the plaintiffs under §§ 215 and 216 of the National Industrial Recovery Act, 48 Stat. 207, 208, and under §§ 701 and 702 of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, pages 787, 789. The appeals are from judgments dismissing for insufficiency complaints which alleged that the statutes were unconstitutional because they violated the Fifth Amendment and unlawfully delegated the power of Congress. These objections the plaintiffs specified upon the argument by asserting that the statutes set up an unequal and arbitrary standard of taxation, dependent upon each corporation's own choice; that it was oppressive and unreasonable to compel it to use indefinitely the "declared value" once chosen, regardless of any change in the actual value of the capital stock; and that in substance power had been delegated to the corporations to tax themselves.

The statutes were attempts to simplify the administration of an "excess profits tax" which had caused great confusion and difficulty during the years following the World War. The general theory of the earlier statute had been that the income of a corporation above a percentage on its capital, taken as a standard or norm, should be taxed at a higher rate than the rest; it was an effort to impose added burdens upon that part of the profits which the war alone made possible. In 1933 it was again thought desirable to impose such a tax, and Congress sought to avoid the earlier administrative troubles. To do so it hit upon the device of allowing corporations to appraise their capital stock for themselves, and of imposing upon the appraised value a tax of one-tenth of one per cent, which was the "capital stock tax" here in question. Obviously there must be some inducement to a fair appraisal, and for that reason the statutes provided that in addition to the tax so imposed the corporation should pay a tax of five per cent upon that part of its income which exceeded 12½% of the appraised value ("declared value"). This was the "excess profits tax," eo nomine. The two taxes were in this way ingeniously interlocked so as to put taxpayers in a deliberately planned dilemma: if they reduced the "declared value" of their capital, they reduced pro tanto that part of their income which was exempt from the "excess profits tax"; if they raised it, they increased the "capital stock tax." Apparently the purpose was in this way to secure some correspondence between the "declared value" and the actual value of the capital stock; this is borne out by the provision for yearly adjustments for additions to, and deductions from, capital. Indeed, it is the plaintiffs' chief complaint that these did not result in keeping the declared and actual values in step; changes in the value of the property were not adequately reflected. But the truth is that, whatever the purpose, the actual value of the capital stock was irrelevant in the scheme, for it could only remotely affect the taxpayer's determination of the "declared value." In making that determination the optimum for any year would be a value which was eight times the income of that year; the

actual capital was wholly unimportant save as it might determine income. This was true because in any year in which it was exactly eight times the income, the taxpayer would have neither "excess profits tax" to pay, nor any "capital stock tax" above what was exactly necessary.

We will not say that, if any adjustment for changes in income had been essential to the constitutional validity of the tax, those provided would not have been enough, notwithstanding the fact that they did not directly concern income at all, and that they were far from complete as to capital. At least there was a rough correspondence between the "adjusted declared value" and the actual capital, and perhaps that was enough. This we need not however decide because we think that no adjustments whatever were necessary. It is quite true that the taxpayer had to choose, once for all, which meant that in substance it had to forecast its average income for the period during which the statute should remain upon the books. That did indeed impose upon it an impossible duty; but the consequences of failure were not so harsh that the imposition trenched upon the Fifth Amendment. In any year in which the "declared value" overshot the mark, the taxpayer would indeed pay a greater tax than it need, but only upon one-tenth of one per cent of the excess. In any year in which the "declared value" undershot it, the taxpayer would pay a tax of five per cent upon so much of the income as the "declared value" did not cover. The second tax was the heavier and could in practice be reasonably insured against by a liberal allowance for "declared value," the course generally in fact adopted. To say that Congress could not choose a scheme implemented by such mild sanctions, as an alternative to actually computing an "excess profits tax" with all the uncertainty and litigation which that had involved, would be most unreasonably to circumscribe its powers to establish a convenient and flexible fiscal system.

The argument addressed to the unlawful delegation of power needs little consideration. It assumes that because the taxpayers could fix their own tax by means of the "declared value," the power to tax was delegated to them. It is quite true that the amount was left to them;

practically, they had the privilege of paying a high "capital stock tax" and no "excess profits tax," or a lower "capital stock tax," coupled with an "excess profits tax." But statutes frequently grant the privilege of an option to those on whom they impinge; and so long as the legislature itself fixes the alternatives within which the choice must be made, it has never been considered that there is an unlawful delegation of power.

The question has come up very often, though never before in a circuit court of appeals; it has always been decided in favor of the constitutionality of the statutes. The Court of Claims has passed upon it three times. Chicago Telephone Supply Co. v. United States, 23 F.Supp. 471; Allied Agents, Inc., v. United States, 26 F.Supp. 98; Tennessee Consolidated Co. v. United States, 89 Ct.Cl. 542. There have been fourteen decisions in the district courts, besides those here on appeal. Rosoff Tunnel Corp. v. Higgins, D.C.S.D. N.Y., 28 F.Supp. 880; Midvale Paper Board Co. v. United States, D.C.S.D.N.Y., 31 F.Supp. 851; Mountain Iron Co. v. United States, D.C.Minn., 31 F.Supp. 895; Isthmian Steamship Co. v. United States, D.C.Del., 33 F.Supp. 1007; Kentucky Fire Brick Co. v. Glenn, D.C.W.D.Ky., 34 F. Supp. 35; American Viscose Corp. v. Rothensies, D.C.E.D.Pa., 34 F.Supp. 217; Lake Terminal Railroad Co. v. United States, D.C.N.D.Ohio, 34 F.Supp. 963; Stanolind Oil & Gas Co. v. Jones, D.C.W. D.Okl., 34 F.Supp. 965; Udylite Co. v. United States (E.D.Mich.), decided December 8, 1939 [1]; Gary Land Co. v. Smith (S.D.Ind.), decided January 22, 1940[1]; Oil Well Supply Co. v. Thomas (N.D.Tex.), decided February 20, 1940[1]; Southeastern Compress & Warehouse Co. v. Page, D.C. N.D.Ga., 1 F.R.D. 363, decided March 20, 1940; Utah Oil Refining Co. v. Hinckley[1] (Utah), decided May 21, 1940; Michigan Limestone and Chemical Co. v. United States, D.C.E.D.Mich., decided May 24, 1940.[1] The Board of Tax Appeals has decided it three times. W. & K. Holding Corp. v. Commissioner, 38 B.T.A. 830; Del Mar Addition v. Commissioner, 40 B.T.A. 833; and Meco Production Co. v. Commissioner, 41 B.T.A. ——, May 8, 1940. Such unanimity strongly confirms our independent conclusion.

Judgments affirmed.

---

[1] No opinion for publication.