L. B. HIRSCH, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

MAX S. AND CLEMENTINE HIRSCH, PETITIONERS, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 95782, 98539.   Promulgated August 20, 1940.

*Robert T. Jacob, Esq.,* and *Samuel B. Weinstein, Esq.,* for the petitioners.

*Edward C. Adams, Esq.,* for the respondent.

OPINION.

SMITH: These proceedings, consolidated for hearing, involve deficiencies in income tax and penalties for 1935 and 1936 as follows:

| Petitioner | Docket No. | Year | Deficiency | 50% penalty | 5% penalty |
|---|---|---|---|---|---|
| L. B. Hirsch | 95782 | 1935 | $1,174.60 | $595.30 | |
| | | 1936 | 180.73 | | $9.04 |
| Max S. and Clementine Hirsch | 98539 | 1935 | 9,340.78 | | |

The questions in issue are:

(1) Whether the redemption by a corporation of a portion of its capital stock in cancellation of the indebtedness of two of its stockholder-officers, the petitioners L. B. Hirsch and Max S. Hirsch, in 1935, was essentially equivalent to a taxable dividend; and whether

the failure of L. B. Hirsch to report the transaction in his return for 1935 constituted fraud.

(2) Whether one of the petitioners, Max S. Hirsch, is entitled to a bad debt deduction in 1935 in respect of a loan which he had made to his brother-in-law in a prior year.

(3) Whether the petitioner, Max S. Hirsch, is entitled to interest deductions in 1935 on life insurance policy loans, where such interest was not paid in cash in that year but was added to the principal amount of the loans.

(4) Whether the petitioner, L. B. Hirsch, is entitled in 1935 and 1936 to an exemption of $2,500 as head of a family and credits of $1,200 for three dependents; and whether in claiming such exemption and credits in 1936 the petitioner incurred the 5 percent negligence penalty which the respondent has asserted for that year.

The several contentions of the petitioners will be considered separately.

### Issue 1.

*(a) Surrender of stock in payment of indebtedness to corporation, whether essentially equivalent to a taxable dividend. (b) Fraud penalty for failure to report transaction in return.*

FACTS.—Petitioners Max S. Hirsch and Clementine Hirsch are husband and wife and filed joint income tax returns for 1935 and 1936. Petitioner L. B. Hirsch is a brother of Max S. Hirsch. All are residents of Portland, Oregon.

During 1935 and 1936 Max S. Hirsch and L. B. Hirsch were president and vice president, respectively, of the Hirsch Weis Manufacturing Co., a corporation engaged in the business of manufacturing and selling work clothes, canvas materials, and related products, with its principal place of business at Portland.

The Hirsch Weis Manufacturing Co., hereinafter sometimes referred to as the company, was organized under the laws of the State of Oregon in 1912, with an authorized capital stock of $100,000, divided into 1,000 shares of common stock of a par value of $100 each. Of the original stock issue, Max S. Hirsch subscribed and paid for 600 shares; L. B. Hirsch, 160 shares; Clara Behrens, sister of Max S. and L. B. Hirsch, 40 shares; H. A. Weis, 100 shares, and E. A. Gerst, 100 shares.

On or about December 20, 1920, the authorized capital stock of the company was increased to $700,000 (7,000 shares of $100 par value each) and a 500 percent stock dividend was declared and paid. At or about that time 7 shares were issued to a son of Max S. Hirsch, 34 shares to a nephew, and 12 shares to a niece.

The stockholders and the number of shares of stock held by each on December 21, 1920, and on December 20, 1935, were as follows:

| Stockholder | Shares owned Dec. 21, 1920 | Shares owned Dec. 20, 1935 | Stockholder | Shares owned Dec. 21, 1920 | Shares owned Dec. 20, 1935 |
|---|---|---|---|---|---|
| Max S. Hirsch | 3,600 | 3,600 | H. Minsch | 34 | 34 |
| L. B. Hirsch | 960 | 1,000 | E. Doering | 12 | 12 |
| H. A. Weis | 600 | 634 | H. Hirsch | 7 | 7 |
| E. A. Gerst | 600 | 598 | | | |
| Clara Behrens | 240 | 74 | Total | 6,053 | 5,959 |

Max S. Hirsch has been president and general manager of the company since incorporation. For a number of years prior to 1935 he and L. B. Hirsch borrowed large sums of money from the company, some on open account and some on promissory notes. It was the practice of both stockholders to give their promissory notes to the company, bearing interest at the rate of 6 percent per annum, for amounts of money borrowed. They paid the amounts with interest from time to time out of dividends received from the company. On May 6, 1932, Max S. Hirsch owed no money on notes to the company. On May 6, 1932, he borrowed $2,500 from the company, giving his promissory note therefor. He owed $47,100 to the company on his notes at January 1, 1935. He paid $6,000 in cash on March 1, 1935, which left him owing a balance of $41,100.

L. B. Hirsch owed no money on notes to the company during 1928 or on January 1, 1929. He borrowed $4,000 on his note on February 5, 1929. At December 14, 1935, he owed the company on notes $14,186.18.

The total indebtedness of officers and employees to the company on December 31, 1934, was $54,859.44, nearly all of which was owed by the two principal stockholders, the petitioners herein.

On December 20, 1935, Max S. Hirsch's total indebtedness to the company amounted to $58,010.51, of which amount $41,100 was represented by his promissory notes, $13,123.10 was on open account, $1,287.41 was accrued interest, and $2,500 was represented by the note of a third party which he had assumed. The indebtedness of L. B. Hirsch to the company at that time was $14,186.18, all of which was represented by promissory notes.

Prior to June 1934 the company had made a practice of borrowing operating funds from the local banks at the normal interest rates of 5 to 6 percent. In 1934, however, it began selling its commercial paper through brokers as a means of financing its business operations and was able to secure funds at the much lower interest rates of 1 or 1¼ percent.

The brokerage concern which was marketing the company's commercial paper requested an audit of the company's books by a firm

of certified public accountants. In making such audit of the company's books for 1934 the auditors in charge of the examination, after consultation with the brokerage firm, recommended that as a protection to the company's financial rating the loans of the stockholders appearing in the company's books be liquidated.

On or shortly prior to December 21, 1935, the directors of the company, after discussing the matter informally, decided that Max S. Hirsch and L. B. Hirsch should pay off their indebtedness to the company in whole or in part by turning in 10 percent of their stock at its par value of $100 per share. The other stockholders were to have the same privilege, that is, of turning in 10 percent of their stockholdings at $100 per share. Accordingly, on December 21, 1935, Max S. Hirsch surrendered 500 of his shares of stock and L. B. Hirsch surrendered 100 of his shares in partial liquidation of their loans. Twenty-six shares were turned in by two other stockholders during 1935 and in subsequent years additional shares were turned in by other stockholders under the same arrangement.

In the company's books closing journal entries were made under date of December 31, 1935, showing a debit of $62,600 to "Treasury Stock" and a credit of a like amount to "General Ledger," with the notation "To take up charges from General Ledger." Also there was a debit to "Capital Stock" of $62,600 and a corresponding credit to "Treasury Stock," with the notation "To show cancellation of Stock."

No minutes of the informal meeting of the directors held on or about December 21, 1935, were made at that time but several years later the following minutes dated December 21, 1935, were prepared and posted in the company's books:

BE IT REMEMBERED, that at 8 P. M. Dec. 21, 1935 at the office of the company, Front & Burnside, a special meeting of the Directors of the Hirsch Weis Mfg. Co. was held, at which all directors of said corporation were present.

The president called attention to the indebtedness to the corporation of L. B. Hirsch and Max S. Hirsch and stated that there was no other way at this time or in the near future that this indebtedness be paid by either debtor excepting to sell to the corporation, part of their respective holdings of shares in the corporation.

After a great deal of discussion, it was moved, duly seconded, and carried that said L. B. Hirsch and Max S. Hirsch sell to the corporation, 10% of its shares of stock in the corporation at a par value of $100.00 per share, giving the same privilege to each and every stockholder who desires to take advantage of it now or anytime in the future—that is 10% of their holdings in the corporation, as of Dec. 21, 1935.

As 10% of the holdings of shares of stock in the corporation of said Max S. Hirsch would not pay the complete indebtedness with interest and a certain note of John Schibel that said Max S. Hirsch assumed, it was moved, seconded and carried that the corporation buy from said Max S. Hirsch an additional 4% or a total of approximately 14% of said Max S. Hirsch holding of shares

of stock in the corporation which would then pay the complete indebtedness to the corporation with interest as well as the note referred to.

There being no further business to come before the Board of Directors, there was a motion made, seconded and carried to adjourn.

MAX S. HIRSCH,
*President*

H. A. WEIS,
*Treasurer*

The net earnings and dividends of the company over the period 1913 to 1935, inclusive, were as follows:

| Period or year | Net earnings | Dividends | Period or year | Net earnings | Dividends |
|---|---|---|---|---|---|
| 3/1 to 12/31/13 | $35,900.71 | ---------- | 1924 | $56,302.02 | $36,000 |
| 1914 | 16,562.41 | $6,000 | 1925 | 23,645.09 | 42,000 |
| 1915 | 47,107.32 | 10,000 | 1926 | 20,194.50 | 42,000 |
| 1916 | 90,402.78 | 25,000 | 1927 | 56,934.69 | 36,000 |
| 1917 | 48,858.96 | 25,000 | 1928 | 54,428.85 | 72,090 |
| 1918 | 71,825.43 | 6,000 | 1929 | 27,150.70 | ---------- |
| 1919 | 131,897.49 | 10,000 | 1930 | (48,706.08) | ---------- |
| 1920 | 9,298.35 | 25,000 | 1931 | (41,774.89) | ---------- |
| 12/31/20 | ---------- | {500% stock dividend | 1932 | (22,317.00) | ---------- |
| | | | 1933 | 65,207.64 | ---------- |
| 1921 | 22,403.94 | ---------- | 1934 | 56,337.66 | ---------- |
| 1922 | 128,482.69 | 36,000 | 1935 | 30,654.17 | ---------- |
| 1923 | 137,594.41 | 48,000 | | | |

The balance sheets of the Hirsch Weis Manufacturing Co., as shown by its income tax returns for 1934 and 1935, at December 31, 1933, December 31, 1934, and December 31, 1935, show the following:

| | Dec. 31, 1933 | Dec. 31, 1934 | Dec. 31, 1935 |
|---|---|---|---|
| **ASSETS:** | | | |
| Cash | $1,889.88 | $24,839.33 | $38,380.87 |
| Notes receivable | 83,682.97 | 96,483.21 | 19,620.57 |
| Accounts receivable | 181,908.91 | 164,838.19 | 156,431.93 |
| Inventories | 329,990.13 | 424,771.57 | 410,342.03 |
| Other investments | 46,270.86 | 39,297.01 | 50,539.75 |
| Deferred charges | 5,760.01 | ---------- | 441.69 |
| Capital assets (less reserves for depreciation) | 121,052.58 | 113,999 02 | 111,698.86 |
| Other assets | 12,550.00 | 20,360.85 | 23,502.55 |
| Total | 783,105.34 | 884,589.18 | 810,958.25 |
| **LIABILITIES:** | | | |
| Notes payable | $72,500.00 | $117,500.00 | $85,000.00 |
| Accounts payable | 15,184.23 | 27,298.01 | 31,380.17 |
| Mortgages | 3,406.07 | ---------- | ---------- |
| Accrued expenses | 4,792.50 | 13,000.00 | 10,353.74 |
| Capital stock | 600,900.00 | 600,900.00 | 533,300.00 |
| Undivided profits | 86,322.54 | 125,891.17 | 150,924.34 |
| Total | 783,105.34 | 884,589.18 | 810,958.25 |

In his income tax return for 1935 Max S. Hirsch reported the surrender of his stock in payment of his indebtedness to the company as a capital transaction. The respondent has determined in his deficiency notice that the transaction constituted a redemption or cancellation of such stock by the company "at such time and in such manner as to make the distribution and cancellation or redemption essentially equivalent to the distribution of a taxable dividend within the meaning of section 115 (g) of the Revenue Act of 1934."

Petitioner L. B. Hirsch did not report the transaction in his return and for his failure to do so the respondent has asserted a 50 percent fraud penalty under section 293 (b) of the Revenue Act of 1934.

The redemption of stock in these proceedings was at such time and in such manner as to make the redemption essentially equivalent to the distribution of a taxable dividend.

The failure of L. B. Hirsch to report the redemption in his return was not due to fraud with intent to evade tax.

OPINION.—Section 115 (g) of the Revenue Act of 1934 provides:

SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

The respondent has determined that the redemption of its stock by the Hirsch Weis Manufacturing Co., as described above, was essentially equivalent to the distribution of a taxable dividend within the meaning of the statute. He has further determined that the petitioner, L. B. Hirsch, filed a false and fraudulent return for 1935 by reason of his failure to report the transaction in his income tax return for that year.

The first question for consideration is whether the redemption of a portion of the shares of stock of the two petitioners in December 1935 was "at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend." The petitioners argue that it was not; that the certified public accountants who were auditing the books of the company for 1934 (apparently during the year 1935), at the instance of the brokerage concern engaged in marketing the company's commercial paper, recommended the liquidation of the debts owed to the company by its principal stockholders; that the stockholders were not in funds for the repayment of the loans; and that the only way in which the indebtedness could be liquidated was to surrender some of their stockholdings for redemption.

In this connection it should be noted that the redemption of the shares of stock by the company did not operate to increase the surplus or undivided profits of the company. The debts owing to the company by the principal stockholders were carried on the company's books of account as "Notes Receivable" and "Accounts Receivable." The net effect of the redemption was to reduce the ratio between current assets and current liabilities. Even if, from the broker's stand-

point, the financial statement of the company was improved by reducing the amounts owed to the company by the principal stockholders, the relation of current assets to current liabilities was rendered less favorable.

The evidence shows that during the depression years 1930 to 1934, inclusive, the principal stockholders borrowed large amounts from the company. The company paid no dividends during these years. What use was made of the funds borrowed is not shown by the evidence. It appears, however, from an inspection of the income tax return of Max S. Hirsch for 1935 that he was interested in investing in securities wholly unrelated to the company's business. In 1935 he sold securities which he had purchased in 1934 and 1935 at a cost of $12,460.70. It may be that the petitioner Max S. Hirsch's investments could not be sold to advantage in 1935 and his debts paid to the company. But it is clear that the two principal stockholders of the company borrowed from the company at a time when the company needed the money in its business operations; for it was under the necessity of borrowing large amounts of money from banks and upon its commercial paper through brokers. Through the redemption of the shares the two principal stockholders received assets of the corporation of a value of $60,000. The financial condition of the company was weakened by the redemption.

In *J. Natwick*, 36 B. T. A. 866, the Board said:

Without deciding whether the question presented here is purely one of fact or a mixed question of fact and law, we are of the opinion that the respondent is correct in maintaining in this case that his determination under this, as under other provisions of the statute, carries a presumption of correctness which must be overthrown by a preponderance of the evidence on the part of the petitioner. We said in *George Hyman*, 28 B. T. A. 1231, at page 1233: "From such facts it is just as conceivable that the redemption and cancellation were essentially equivalent to a dividend as it is that they were not; and, since the respondent has determined that they were, and the burden of proof is on petitioner, we can not affirmatively find that it was not."

Although it may not be said in these proceedings that there was any relation between the declaration of the 500 percent stock dividend in 1920 and the redemption of the shares in 1935, we think that the evidence supports the determination of the respondent that the redemption of the shares was essentially equivalent to the distribution of a taxable dividend. His determination is therefore sustained.

The fraud issue arises from the failure of the petitioner, L. B. Hirsch, to report in his income tax return for 1935 the redemption of 100 shares of his Hirsch Weis Manufacturing Co. stock. His defense is that he did not consider that he had any taxable gain on the transaction, since the shares of stock surrendered to the company were worth as much or more than the consideration received for

them, that is, the cancellation of $10,000 of his indebtedness to the company.

L. B. Hirsch's income tax return for 1935 was made up by an attorney, Robert T. Jacob, who also acted as tax adviser for Max S. Hirsch and for the Hirsch Weis Manufacturing Co. Jacob testified that he made up the return from figures which the taxpayer read off to him out of a notebook in which he kept a record of items of income and deductions and that the taxpayer made no mention of having surrendered any stock of the Hirsch Weis Manufacturing Co. in that year, and that he did not learn of that until he saw the report of the examining revenue agent. Jacob further testified that he made up the 1935 return of Max S. Hirsch and reported therein a capital gain on the shares which he surrendered.

In our opinion the evidence does not show that the omission by L. B. Hirsch of the transaction in question from his income tax return for 1935 was due to fraud with intent to evade tax. Since the burden of proof with respect to the fraud issue rests upon the respondent, the assessment of the fraud penalty is not sustained.

## Issue 2.

### Bad Debt Deduction.

Facts.—In 1925 Max S. Hirsch, hereinafter in this issue referred to as the petitioner, loaned to his brother-in-law, Leo W. Seller, $15,000 to invest in a business of manufacturing house dresses. The business was organized at or about that time at Seattle, Washington, by Seller and Sol Garde under the name of the Garde-Seller Co. Petitioner's loan was evidenced by Seller's promissory note and was secured by his stock in the company. Interest on this note was paid regularly to September 1, 1930. In 1932 the Garde-Seller Co. (then known as the Leman-Seller Manufacturing Co.) became insolvent and was placed in liquidation in June of that year. Seller turned over all of his share of the proceeds from the liquidation to the petitioner to apply against his note. Liquidation of the Leman-Seller Manufacturing Co. continued for several years, due to a number of accounts receivable being among the assets. From 1932 to 1934, inclusive, the following proceeds from the liquidation were received and applied against the note:

| | |
|---|---:|
| 1932 | $4,155.00 |
| 1933, first half year | 1,050.00 |
| 1933, second half year | 268.84 |
| 1934, Jan. 1 to Apr. 4 | 10.00 |
| 1934, Apr. 5 to July 25 | 36.92 |
| 1934, July 26 to Oct. 15 | 10.00 |
| Total | 5,530.76 |

No further payments on principal or interest were ever received by the petitioner.

On May 9, 1934, the law firm in charge of the liquidation of the Leman-Seller Manufacturing Co. wrote to the petitioner stating that the only remaining assets of the company were "collection items of uncertain value." On November 9, 1935, the petitioner wrote the following letter to one of the attorneys in the liquidating firm:

Nov. 9, 1935.

Mr. Edward G. Dobrin,
c/o Bogle, Bogle & Gates,
6th Floor Central Bldg.,
Seattle, Wn.

Dear Mr. Dobrin:

On May 9, 1934 you advised me that there was some remaining assets of uncertain value which Mr. Schermer agreed to describe in a letter to you and to divide the net recoveries three-eighths and five-eighths as collected.

I have never heard about these remaining assets up to date, either about all of them or any part so I would appreciate it if you would investigate and advise if there is any possible chance for any additional recoveries.

My loss in advancing or loaning money to Mr. Seller is not yet ascertained and as I wish to do so by the first of the year so that I can take my loss into consideration when making up my income tax statement, I would appreciate it if you would write me in detail.

Be kind enough to word your letter in such a way that the Federal State and Tax Commission do not question the deduction of my loss nor do they take a position that this loss should have been charged off the year previous.

I am sure you will understand to what I refer and thank you in advance.

With kindest personal regards, I am

Yours truly,

MSH : MD

The following reply to the above letter was received by the petitioner under date of December 10, 1935:

Seattle
December 10, 1935.

Mr. Max S. Hirsch,
67 West Burnside Street,
Portland, Oregon.

Dear Sir:

On May 9, 1934 we advised you that the only remaining assets of Leman-Seller Manufacturing Company are collection items of uncertain value which Mr. Schermer agreed to describe in a letter to us and to divide the net recovery three-eighths and five-eighths as collected.

Mr. Schermer has failed to give us the letter requested and although often requested to do so, has failed to give us any report. We wrote to him in this connection without response from him, under dates of October 12, 1934, January 15, 1935, February 26, 1935, March 26, 1935 and August 17, 1935.

Under the circumstances, we believe that you may consider that no further recovery will be forthcoming.

Very truly yours,

[Signed]  Bogle, Bogle & Gates.

After the liquidation of the Leman-Seller Manufacturing Co. was begun in 1932, Seller worked as a traveling salesman until the latter part of 1935, when he suffered a slight stroke. He was able to return to his work after several weeks but never fully regained his health. His net earnings in 1934 and up to the time of his illness in 1935 were from about $2,400 to $2,800 per year. He had no property in either year out of which his indebtedness to the petitioner might have been paid.

The petitioner knew or had reason to believe that the unpaid balance of Seller's indebtedness to him at the close of 1934 was uncollectible.

OPINION.—In his deficiency notice the respondent determined that no deductible loss was sustained by the petitioner in 1935 on account of the worthlessness of the unpaid balance of Seller's indebtedness, but did not state any specific grounds for the disallowance of the deduction claimed in the petitioner's return. In these proceedings, however, the respondent makes the contention, among others, that the debt became worthless in 1934 and therefore may not be availed of as a deduction in 1935. We think that the evidence bears out this contention. The loan to Seller was made for the purpose of establishing him in business. As petitioner well knew, it was subject to the hazards of the business. The business failed in 1932 and was completely liquidated by the end of 1933, except for a few doubtful accounts from which only small recoveries were subsequently made. The evidence shows no grounds for any reasonable expectation on petitioner's part that any further substantial recovery of the debt would ever be made.

That the petitioner himself was apprehensive about his right to claim the deduction in 1935, as against a prior year, is indicated by the letter which he wrote to the liquidating agents on November 9, 1935.

A deduction for a worthless debt must be taken in the year when the taxpayer ascertains, or reasonably should ascertain, that the debt has become worthless. *Avery* v. *Commissioner*, 22 Fed. (2d) 6.

The evidence before us fails to overcome the presumptive correctness of the respondent's determination that the petitioner is not entitled to any deduction on account of the worthlessness of the debt in question in 1935.

ISSUE 3.

*Interest deduction—interest on life insurance policy loans added to principal amount of loans.*

FACTS.—In his income tax return for 1935 L. B. Hirsch, referred to in this issue as the petitioner, claimed an interest deduction of

$491.46, which the respondent disallowed on the ground that the interest was not actually paid by the petitioner in 1935 and is therefore not deductible in petitioner's return for that year, which was made on the cash basis.

At the hearing it was stipulated that $78.08 of the amount of interest claimed as a deduction in 1935 was paid by the petitioner in 1936 and is deductible in his return for that year. In the redetermination of the deficiency for 1936 under Rule 50 the $78.08 payment of interest will be allowed.

The $491.46 represents interest on loans which the petitioner had obtained on two life insurance policies from the insuring companies. The interest on the loans was not actually paid in cash by the petitioner in 1935, but was added to the principal amount of the loans. The policies had cash reserves sufficient to cover the resulting increase in the loans.

From these facts it is plain that there was no actual payment of the interest in dispute by the petitioner in 1935. The petitioner merely increased his indebtedness to the insurance companies by having the interest obligation carried over into the principal indebtedness. Petitioner actually paid out nothing in cash.

OPINION.—In *Eckert* v. *Burnet*, 283 U. S. 140, the Court held that a bad debt deduction was not allowable to a taxpayer on the cash basis who had given his promissory note in settlement of his liability as endorser of the notes of the corporation in which he was interested. In its opinion the Court said:

\* \* \* For the purpose of a return upon a cash basis there was no loss in 1925. As happily stated by the Board of Tax Appeals the petitioner "merely exchanged his note under which he was primarily liable for the corporation's notes under which he was secondarily liable, without any outlay of cash or property having a cash value." A deduction may be permissible in the taxable year in which the petitioner pays cash. The petitioner says that it was definitely ascertained in 1925 that the petitioner would sustain the losses in question. So it was, if the petitioner ultimately pays his note. So was the tax considered in *United States* v. *Mitchell*, 271 U. S. 9, 12, 46 S. Ct. 418, 70 L. Ed. 799, but it could not be deducted until it was paid.

In *United States* v. *Mitchell*, 271 U. S. 9, it was held that taxes are deductible by a taxpayer on the cash basis in the year when paid. "It was not the purpose of the Act", the Court said, "to permit gross income actually received to be diminished by taxes or other deductible items disbursed in a later year, even if accrued in the taxable year." To the same effect is *Helvering* v. *Price*, 309 U. S. 409, holding that losses likewise are deductible by a taxpayer on the cash basis in the year when payment is made. The same rule was applied to interest deductions in *Massachusetts Mutual Life Ins. Co.* v. *United States*, 288 U. S. 269. See also *Barto Co.*, 21 B. T. A. 1197; *Oscar G. Joseph*, 32 B. T. A. 1192; *S. E. Thomason*, 33 B. T. A. 576;

dismissed (C. C. A., 7th Cir.), April 29, 1937; *Fred W. Leadbetter*, 39 B. T. A. 629.

The respondent correctly disallowed the interest deduction of $491.46 claimed by the petitioner in his 1935 return.

## Issue 4.

*(a) Personal exemption as head of family. (b) Credit for dependents. (c) Negligence penalty.*

Facts.—In his returns for 1935 and 1936 L. B. Hirsch, referred to in this issue as the petitioner, claimed a personal exemption of $2,500 as head of a family and a credit of $1,200 for three dependents. The respondent in his deficiency notice allowed the petitioner a personal exemption of only $1,000. and disallowed the credit for dependents. In addition the respondent asserted a 5 percent penalty for 1936 amounting to $9.04, on the ground that the petitioner was negligent in claiming the exemption and credit referred to. The negligence penalty has not been asserted for 1935 for the reason, as respondent states in his brief, that the larger 50 percent fraud penalty has been asserted for that year.

The petitioner is unmarried. Since 1922 he has resided continuously at 1115 S. W. King Avenue, Portland, Oregon, with his sister, Eda H. Low, her husband, Julius Low, and their daughter, Barbara. The persons named were of the ages in 1935 of about 55, 60, and 15 years, respectively.

The home in which the petitioner, his sister, her husband, and their daughter resided was purchased by the petitioner and for personal reasons deeded to his sister as a gift in 1922. In 1932 or 1933 the property was mortgaged to secure a loan to the petitioner of $10,000, which petitioner subsequently paid off.

During the years 1935 and 1936 the petitioner contributed about $350 or $400 per month to the general expenses of maintaining the household in which he and the others resided. In addition he paid the medical bills of different members of the household and contributed to the educational expense of Barbara.

In 1929 or 1930 Julius Low suffered an eye affliction, which resulted in a permanent impairment of his eyesight. Since that time he has conducted a small business of selling wines and cigars on a commission basis to his friends and acquaintances in Portland. He has no office and no established place of business. His earnings amount to about $400 or $500 per year. In his return for 1935 the petitioner reported $463.42 as income earned by Julius Low in that year.

During 1935 and 1936 the petitioner, his sister, Eda H. Low, and her husband, Julius Low, owned all the stock of the Hirsch Invest-

ment Co., a corporation organized in 1911 with a capital stock of $20,000 (200 shares of a par value of $100 each), which was later reduced to $5,000 (50 shares of a par value of $100 each). At December 31, 1935, the petitioner owned 27.5 shares, Julius Low 18.75 shares, and Eda H. Low 3.75 shares of the Hirsch Investment Co. stock. The principal asset of the corporation was a parcel of improved real estate consisting of a one-story concrete building which was rented. The financial condition of the corporation as at December 31, 1935, was as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | $562.28 | Notes payable | $20,000.00 |
| Accounts receivable | 28,492.13 | Capital stock | 5,000.00 |
| Land | 4,632.82 | Surplus | 32,934.60 |
| Building | 29,597.80 | | |
| Depreciation reserve | (5,350.43) | Total | 57,934.60 |
| Total | 57,934.60 | | |

The accounts receivable included $20,688.71 owed to the corporation by L. B. Hirsch, $1,031.70 owed by Julius Low, and $6,387.92 owed by the stockholders jointly and charged to "Stockholders Joint Account." The last stated amount of $6,387.92 represented moneys withdrawn from the corporation's funds by the stockholders and used by them, in whole or in part, for general household purposes. The net earnings of the corporation as reported in its income tax returns were $869.78 in 1935 and $979.52 in 1936.

At the close of 1935 the petitioner was indebted to his sister, Eda H. Low, in the amount of $9,241, on which amount interest was credited for that year.

OPINION.—The respondent's contentions are that the petitioner was not the head of a family and that he had no dependents in 1935 or 1936, entitling him to the exemption and credit which he claimed in his returns for those years. The pertinent provisions of the statute are found in section 25 (b) (1) and (2) of the Revenue Acts of 1934 and 1936, and are as follows:

SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME.

\*      \*      \*      \*      \*      \*      \*

(b) CREDITS FOR BOTH NORMAL TAX AND SURTAX.—There shall be allowed for the purposes of the normal tax and the surtax the following credits against net income:

(1) PERSONAL EXEMPTION.—In the case of a single person, a personal exemption of $1,000; or in the case of the head of a family or a married person living with husband or wife, a personal exemption of $2,500. A husband and wife living together shall receive but one personal exemption. The amount of such personal exemption shall be $2,500. If such husband and wife make separate returns, the personal exemption may be taken by either or divided between them.

(2) CREDIT FOR DEPENDENTS.—$400 for each person (other than husband or wife) dependent upon and receiving his chief support from the taxpayer if such dependent person is under eighteen years of age or is incapable of self-support because mentally or physically defective.

Prior revenue acts have contained similar provisions. Consistent with prior regulations, the Commissioner has ruled, in article 25–4 of Regulations 86, that:

A head of a family is an individual who actually supports and maintains in one household one or more individuals who are closely connected with him by blood relationship, relationship by marriage, or by adoption, and whose right to exercise family control and provide for these dependent individuals is based upon some moral or legal obligation. * * *

In *John H. Watson, Jr.*, 38 B. T. A. 1026, we held that a taxpayer who was unmarried and lived with his mother and who, by reason of his mother's residence with him, paid out approximately $5,000 per year for household expenses, was not entitled to the exemption of $2,500 as the head of a family, since the mother had ample means of support and had a substantial income of her own. See also *Louise C. Ball*, 16 B. T. A. 785, and *John H. Rudiger*, 22 B. T. A. 204.

On the other hand, we held in *Alfred E. Fuhlage*, 32 B. T. A. 222; affd., *per curiam*, 79 Fed. (2d) 998, that a taxpayer who was unmarried and who maintained a home in which he supported his unmarried sister who had no income or means of support of her own was entitled to the status of head of a family.

The evidence here is that neither the petitioner's sister nor Julius Low nor their daughter Barbara was solely dependent upon the petitioner for support during either of the years involved. Besides Julius Low's earnings, which amounted to between $400 and $500 per year, he and his wife owned nearly half of the Hirsch Investment Co. stock, the book value of which at December 31, 1935, was over $57,000. In addition, petitioner's sister owned the residence in which they all lived, it having been conveyed to her by the petitioner as a gift in 1922, and the petitioner owed her a personal indebtedness of over $9,000.

While the evidence shows that the petitioner generously contributed to the expenses of the household in which they all resided and perhaps enabled his sister and her husband and their daughter to maintain higher living standards than they might have been able to maintain otherwise, it does not show that those persons, or any of them, were dependent upon him for their chief support or that in petitioner's relationship to them he occupied the status of "head of a family", within the meaning of the statute and the regulations.

Although our conclusion is that the petitioner is not entitled to the exemption of $2,500 as head of a family or to any credit for dependents in 1935 and 1936, we do not think that the claim for such

580

exemption and credit in his returns affords any ground for the assessment of the negligence penalty for 1936. The claims at least are colorable and are in the nature of those commonly asserted by taxpayers conscientious in their own endeavor to return the taxes justly due the Government and advised in the preparation of their returns by competent and reliable tax attorneys. The assessment of the negligence penalty is therefore not sustained.

*Decisions will be entered under Rule 50.*