Ada Murphy McFarlane v. Commissioner. Frederick Gordon McFarlane, Sr. v. Commissioner.
McFarlane v. Commissioner
Docket Nos. 37563, 37564.
United States Tax Court
T.C. Memo 1954-40; 1954 Tax Ct. Memo LEXIS 206; 13 T.C.M. (CCH) 467; T.C.M. (RIA) 54144; May 14, 1954, Filed *206 George Denegre, Esq., 847 National Bank of Commerce Building, New Orleans, La., for the petitioners. Jackson L. Bailey, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined income tax deficiencies of $11,014.15 for each of the petitioners in 1948. The sole issue is whether there was a transaction, under section 115(g), I.R.C., essentially equivalent to the distribution of a taxable dividend where petitioner paid his debt to a corporation with that corporation's capital stock. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. Petitioners, husband and wife, are residents of the Parish of Orleans, Louisiana. In 1948 they filed separate income tax returns on a community property basis with the collector of internal revenue for the district of Louisiana. Frederick Gordon McFarlane, Sr., will hereinafter be referred to as the petitioner. On February 19, 1946, petitioner, his wife and their son purchased all of the outstanding stock of Paul, Rice & Levy, Inc., a ship supply company, hereinafter referred to as the Corporation. They paid *207 $131,625 for 405 shares, or $325 a share for all of the capital stock. Of this total purchase price petitioner, his wife and their son borrowed $120,000 from the Louisiana Bank & Trust Company, and $12,000 from F. G. McFarlane, Inc., one of the petitioner's companies. Shortly after the purchase petitioner borrowed $37,000 from the Corporation on open account; from this sum, on February 21, 1946, he paid $25,000 to the Louisiana Bank & Trust Company, and with the balance he repaid F. G. McFarlane, Inc. This payment to the bank reduced the joint indebtedness of petitioner, his wife and their son from $120,000 to $95,000. Periodic payments were made on the debt during 1946, 1947 and 1948, and the final payment was made in 1949. On May 25, 1946, Frank V. Russell, one of petitioner's business advisers, purchased from petitioner 40 shares of the Corporation's stock for $5,000. Later, on July 21, 1948, after a number of business disagreements between Russell and petitioner's son, Russell sold his 40 shares to the Corporation for $18,500, or $462.50 a share. Another major exchange of stock and the one that we are concerned with in these proceedings occurred on December 20, 1948, when *208 petitioner sold 100 shares of his stock to the Corporation for $40,000. Petitioner did not receive cash in this transaction, but the Corporation accepted $37,000 of the stock in repayment of petitioner's 1946 loan, and the remaining $3,000 was credited to his personal account. Of the $3,000, $654.72 offset a debit balance in his personal account. On December 31, 1948, there was a credit balance in petitioner's personal account of $2,345.28. This sale and debt payment were thoroughly discussed by petitioner, his family and Russell for some time prior to the actual exchange of stock. Because the $37,000 debt was carried on the balance sheets as a receivable due from officers and employees, petitioner's son thought that the Corporation's credit could be improved if his father paid this debt. However, petitioner did not have sufficient cash to pay it, and his son suggested that petitioner sell some of the Corporation's stock back to the Corporation and pay the debt with the proceeds. Russell, a certified public accountant, opposed this exchange plan because he thought that it would create a tax problem. At first petitioner favored Russell's opinion, but petitioner's family were forceful *209 and persuaded him that the plan would benefit the Corporation. Petitioner's decision in favor of the plan caused enmity between Russell and petitioner's son, and it was primarily the result of this hostility that Russell sold his stock in the Corporation. The following table shows the disposition of the Corporation's stock from the McFarlane family's original purchase to December 31, 1948: 2/19/46
12/31/46
12/31/47
12/31/48
F. G. McFarlane, Sr.
345
300
163
Ada Murphy McFarlane
405
24
24
F. G. McFarlane, Jr.
10
19
37 1/2
Marie R. McFarlane (daughter)
10
22
40 1/2
Frank V. Russell
40
40
Treasury stock
140
Total
405
405
405
405
On December 20, 1948, petitioner, his wife, son and daughter, who formed the Corporation's board of directors, passed a resolution which in part is as follows: "On motion duly seconded, the following resolution was unanimously adopted: Resolved: It is the opinion of the Board of Directors the corporation is over capitalized and it has been made the decision to reduce the outstanding capital stock by direct purchase of Certificate Number Twenty-Eight on issue to F. G. McFarlane, Sr., in *210 the amount of exactly One Hundred Shares. "The Treasurer was authorized and instructed to purchase certificate No. 28 from F. G. McFarlane, Sr., for the agreed purchase price of Forty Thousand Dollars. The Treasurer is further instructed to pay this amount to Mr. McFarlane, Sr., upon the surrender of the stock certificate. The Treasurer is authorized and instructed to cancel the certificate which will constitute permanent retirement of the capitalization." The 1940 shares of capital stock purchased by the Corporation from Russell and petitioner were held as treasury stock until some time during the year 1949 when the shares were cancelled. No dividends were formally declared or paid by the Corporation during the years 1946, 1947 and 1948. Summarized balance sheets of the Corporation, as reported on its tax returns, are as follows: 12/31/46
12/31/47
12/31/48
ASSETS
Cash
$ 12,172.07
$ 53,516.01
$ 18,204.89
Other
239,480.03
276,574.49
252,056.71
Due from officers and employees
39,472.53
39,121.44
3,257.88
Treasury Stock
58,500.00
Total
$291,124.63
$369,211.94
$332,019.48
LIABILITIES
$117,240.09
$126,796.00
$ 87,617.42
CAPITAL
Capital Stock
$ 40,500.00
$ 40,500.00
$ 40,500.00
Paid-in Surplus
40,500.00
40,500.00
40,500.00
Earned Surplus
92,884.54
161,415.94
163,402.06
Total
$291,124.63
$369,211.94
$332,019.48
*211 Petitioner reported on his 1948 return the sale of 100 shares of the Corporation's stock as a long-term capital gain. He reported the gross sales price as $40,000, and his cost or other basis as $32,500. Respondent's explanation of the adjustment in the deficiency notice is as follows: "(a) After careful consideration of the evidence of record, it is held in accordance with the provisions of section 115(g) of the Internal Revenue Code that you received in community during the year 1948 a taxable dividend in the amount of $40,000.00 from Paul, Rice & Levy, Inc., New Orleans, Louisiana, which dividend you failed to report on your return. Your community one-half share of this adjustment is $20,000.00." The Corporation purchased petitioner's stock for $40,000, and this transaction did not result in a distribution and cancellation or redemption in whole or in part which was essentially equivalent to the distribution of a taxable dividend. Opinion Simply, the issue is whether petitioner received ordinary income or capital gain in a stock transaction with the Corporation. Respondent maintains that the transaction whereby petitioner sold his stock to the *212 Corporation in exchange for the cancellation of a debt was essentially equivalent to the distribution of a taxable dividend under section 115(g). [1] Petitioner, on the other hand, contends that the transaction in question was a sale of capital stock which resulted in a long-term capital gain. Petitioner buttresses his contention with the following arguments: (1) There was a business purpose in the transaction, (2) there was not a pro rata distribution among the shareholders, and (3) the transaction was not an artifice to defeat proper taxation. Numerous cases have established that section 115(g) must *213 be interpreted in the light of the facts in each situation. Hirsch v. Commissioner, 124 Fed. (2d) 24. affirming 42 B.T.A. 566; Bona Allen, Jr., 41 B.T.A. 206. When petitioner paid his corporate debt by transferring 100 shares of stock to the Corporation, this transaction improved the balance sheet by eliminating an account receivable from a corporate official. This in turn was to improve the credit rating of the Corporation and improvement of the corporate credit rating was the purpose of the transaction. The record is clear and convincing in support of this alleged business purpose. Petitioner, his wife, son and daughter testified that this was the purpose behind the transaction. In addition, petitioner's contention was also supported by the testimony of a bank vice president, a certified public accountant, and a rope manufacturer who sold his products to the Corporation. The banker and the manufacturer thought that petitioner's obligation should be paid for this would strengthen the Corporation's credit. as creditors of the Corporation they had for some time suggested that petitioner's debt to the Corporation should be either reduced or *214 liquidated. However, petitioner's financial situation prevented him from paying cash, and another means was sought to offset the debt. We know from the facts the son's suggestion was adopted and the exchange of stock in payment of petitioner's debt was accomplished. We do not believe that this transaction was equivalent to the distribution of a taxable dividend. Bona Allen, Jr., supra. In addition to the many witnesses who testified in behalf of petitioner, certain facts also support petitioner's position. Petitioner was the only stockholder who participated in the transaction. There was no pro rata distribution or declaration of a dividend for the benefit of other stockholders of the Corporation. We recognize that the stockholders, other than petitioner, benefited from the transaction because their percentage interest in the Corporation was increased as his decreased. However, this benefit is not a dividend or even essentially like a dividend. Again, the fact that petitioner did not receive cash in the exchange tends to refute the idea that there was a taxable dividend. It should also be pointed out that petitioner paid for his stock, and did not receive it as a *215 stock dividend. See G. E. Nicholson, 17 T.C. 1399. Cf. William H. Grimditch, 37 B.T.A. 402. In conclusion, while we have carefully considered respondent's arguments, from the record as a whole we find that the transaction was not essentially equivalent to the distribution of a taxable dividend. Therefore, we must find for the petitioner. There is another adjustment to petitioner's net income in the deficiency notice, but our decision precludes the use of this adjustment. Decisions will be entered for the petitioners. Footnotes
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(g) Redemption of Stock. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole of in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩